**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PADDY F. BARRY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  02-2371 (JDB)** |
| **TRUSTEES OF THE INTERNATIONAL ASSOCIATION FULL-TIME SALARIED OFFICERS AND EMPLOYEES OF OUTSIDE LOCAL UNIONS AND DISTRICT COUNSEL'S (IRON WORKERS) PENSION PLAN, et al.,** | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

Presently before the court in this suit brought by plaintiff Paddy F. Barry ("Barry") pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, are defendant Jacob West's renewed motion to dismiss Counts III and IV of the complaint (or, in the alternative, for summary judgment) and plaintiff's renewed cross-motion for summary judgment on those counts.  For the reasons that follow, the Court will deny both motions.

<u>**BACKGROUND**</u>

**A.     Factual Background**

ULLICO is a private stock company, whose Board of Directors has historically consisted primarily of officers of major unions.  <u>See</u> Def.'s Stmt. of Mat. Facts as to Which He Contends There is No Genuine Issue ("Def.'s Stmt.") at 1 ¶ 1.  Mr. West served as a director of ULLICO beginning in the mid-1980's.  <u>Id</u>. at 2 ¶ 2.  During that time, Mr. West purchased stock in

ULLICO.  Id. at 2 ¶ 3; 3 ¶ 7.  The International Association of Full-Timed Salaried Officers and Employees of Outside Local Unions and District Councils Pension Plan (hereinafter "the Plan") is an employee pension benefit plan within the meaning of Section (3)(2) of ERISA.  Id. at 2 ¶ 4. Plaintiff is a participant in the Plan.  Mr. West served as a trustee of the Plan for roughly 12 years, ending in February 2001.  Id. at 2 ¶ 5.

In 1992, while Mr. West was both a Director of ULLICO and a trustee of the Plan, ULLICO offered the Plan, and others, the opportunity to purchase ULLICO Preferred Certificates.  Id. at 3 ¶ 6.  The Plan's investment manager, Kennedy Associates, invested $2,750,000 of the Plan's money in ULLICO Preferred Certificates, which were later converted to Class A stock.  Id.

In 1997, prior to realizing financial success on its investments, ULLICO adopted an eleven-year repurchase program, through which ULLICO each year would repurchase stock from its shareholders.  Id. at 4 ¶ 8.  Under the repurchase program, ULLICO agreed to repurchase shares up to a maximum aggregate amount.  Id. at 4 ¶ 9.  If the total amount of tendered shares was more than the maximum agreed to by the directors, certain shareholders would be prorated with respect to the stock repurchases.  Id.  If a repurchase was oversubscribed, ULLICO would repurchase all shares of those that held less than 10,000 shares, but those with more than 10,000 would be subject to proration.  Id.  On November 3, 2000, the Board approved a $30 million repurchase program (hereinafter the "formal repurchase program") along the lines of the program that was approved in 1997, but pursuant to which the share price was set at $146.04 and all shareholders owning more than 2% of ULLICO stock had to tender all of their shares if they sought to tender any.  Id. at 5 ¶¶ 12.  The Plan's new investment manager, Columbia Partners,

sought to tender all of the Plan's shares, but because the program was oversubscribed, the repurchase was prorated and ULLICO only repurchased 2,421 of the Plan's shares.  Id. at 5 ¶ 13.

In addition to the formal repurchase program, the Board voted to approve a resolution introduced by Chairman Georgine at the November 3, 2000 meeting.  Id. at 7 ¶ 21.  That resolution established a discretionary repurchase program, which the Chairman stated had been ongoing for quite some time with respect to individual, union, and estate shareholders.  See id.; see also Def.'s Exh. 12 at 5.  The Chairman introduced the resolution by stating that he had decided "it would be good to have the Board's confirmation of [his] authority" in this regard. Def.'s Exh. 12 at 5.  The resolution itself, however, did not limit its terms to certain classes of shareholders other than to state generally that shareholders of Class A, Class B, or Capital Stock would be eligible to benefit.  Def.'s Exh. 12 at 5.  Under the terms of the resolution, the Chairman was given the authority to make discretionary repurchases from such shareholders "in his discretion" if he deemed such repurchases to be in ULLICO's best interests and consistent with sound financial practice.  Id.  The share price for such repurchases was not to exceed $146.04.  Id.  On November 21, 2000, the Chairman sent a letter to ULLICO's shareholders, including participants in the Plan, which represented that "the Company continues to reserve the right, pursuant to its By-laws, to repurchase shares outside the [formal] Repurchase Program at $25 per share."  Pl.'s Exh. 16 at 2.

Between May 10, 2000 and November 2000, West and a number of other directors resold their own capital stock to ULLICO pursuant to the discretionary repurchase program at a share price of $146.04.  Def.'s Stmt. at 6 ¶ 18.  The majority of West's shares were resold pursuant to a

Director/Officer Request for Repurchase Form in early August of 2000.[1]  Def.'s Stmt. at 6 ¶ 19.

The Plan did not participate in the discretionary repurchase program, and West never disclosed to

the Plan either the existence of the discretionary repurchase program or his own use of it.  Def.'s

Resp. Stmt. at 8; Pl.'s Stmt. at 7.  Through the discretionary and formal repurchase programs,

ULLICO repurchased a total of $44.6 million in company stock between May 2000 and May

2001, all at the $146.04 share price.  Def.'s Stmt. at 11 ¶ 29.

**B.    Procedural Background**

Plaintiff Barry filed this action on December 4, 2002 (twice amending his complaint on

January 6, 2003 and August 25, 2004) seeking, inter alia, payment to the Plan of all Plan losses

and the original named defendants' gains from the sale of ULLICO stock.  See Second Am.

Compl. (Prayer for Relief).  All of the original defendants filed motions to dismiss plaintiff's

Second Amended Complaint on a number of grounds.  On March 11, 2004, the Court denied

West's motion to dismiss, and granted in part the motion to dismiss of the ULLICO defendants,

leaving only Count VI remaining against them.  The Court held that plaintiff's claim in Count VI

against the ULLICO defendants for knowingly participating in fiduciary breaches by West was

viable.  The Court also granted the motion to dismiss of Joseph J. Hunt, Michael A. Fitzpatrick,

---

[1]West contends that this repurchase occurred in anticipation of his retirement, and claims that he only served on the Board until mid-2001.  Plaintiff, however, contends that West did not actually retire until May 2002.  In response, West claims that the Court has previously found that he retired in mid-2001 and that plaintiff cannot contest that finding here because he did not do so earlier.  See Def. Jacob West's Response to Pl.'s Stmt. of Mat. Facts as to Which There is No Genuine Issue ("Def.'s Resp. Stmt.") at 2.  West is mistaken.  To begin with, the Court never explicitly held that West retired in mid-2001 rather than May 2002.  The date of West's retirement was not at issue during prior rounds of briefing, and, accordingly, was not focused on by the Court.  Moreover, when the Court granted plaintiff's motion for reconsideration and gave the parties leave to file renewed summary judgment motions, it never suggested that the issues to be considered were so limited.

and Dennis R. Toney, trustees of the Plan.  Over the course of the case, moreover, plaintiff has

voluntarily dismissed his action against: Eugene Upshaw; John Wilhelm; Douglas J. McCarron;

Frank Hurt; Earl Kruse; Terrence O'Sullivan; Lenore Miller; Moe Biller; Arthur Coia; John T.

Joyce; Vincent Sombrotto; and John Barry.

Defendant West and the remaining ULLICO defendants, as well as plaintiff, then moved

for summary judgment on all remaining claims.  In its Memorandum Opinion of September 20,

2005, the Court granted the defendants' motions and denied plaintiff's motion, finding that:

> Plaintiff's action has more to do with corporate misconduct at
> ULLICO than with West's alleged breach of his fiduciary duties to
> the Plan.  The thrust of plaintiff's evidence in support of his claims
> is a November 26, 2002 Report of Special Counsel to the ULLICO
> Board of Directors, which addresses alleged misconduct by
> ULLICO officials.  However, claims of corporate malfeasance are
> not before the Court, nor could plaintiff pursue such claims here.
> Rather, plaintiff's only viable action against defendants is for
> breach of fiduciary duties to the [] Plan. . . . [P]laintiff has failed to
> establish such claims.

Barry v. Trustees of the International Ass'n of Full-Time Salaried Officers and Employees of

Outside Local Unions and District Counsel's (Iron Workers) Pension Plan, 404 F. Supp. 2d 145,

157 (D.D.C. 2005).  Thereafter, plaintiff filed a motion for reconsideration, arguing that the

Court misapprehended certain facts relating to the discretionary repurchase program.  The Court

agreed that it may have focused on facts that were more pertinent to the formal, rather than the

discretionary, repurchase program, and granted plaintiff's motion.  See Barry v. Trustees of the

International Ass'n of Full-Time Salaried Officers and Employees of Outside Local Unions and

District Counsel's (Iron Workers) Pension Plan, Civil Action No. 02-2371 at 3 (D.D.C. Feb. 15,

2006) (Order).  The parties were then given leave to file renewed motions for summary

judgment, which the Court considers here.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

To determine whether there is a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. A moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the non-moving party. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252; see also Holbrook v. Reno, 196 F.3d 255, 259-60 (D.C. Cir. 1999).

## ANALYSIS

Counts III and IV of the Second Amended Complaint allege that West breached his fiduciary duties to the Plan by failing to disclose to the Plan the details of the discretionary repurchase program. A fiduciary's duty to disclose is set forth in ERISA § 404(a):

> a fiduciary shall discharge his duties with respect to a plan in the interest of the participants and beneficiaries and . . . with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a). Congress, in passing section 404(a), incorporated within the scope of an ERISA fiduciary's duties those fiduciary duties that exist in the common law of trusts. See Mass. Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 153–54 (1985) (Brennan, J., concurring) (stating that "[c]ongress intended in § 404(a) to incorporate the fiduciary standards of trust law into ERISA, and it is black-letter trust law that fiduciaries owe strict duties running directly to beneficiaries in the administration and payment of trust benefits"). The common law of trusts imposes a duty upon trustees to furnish information to a beneficiary. See Bixler v. Cent. Penn. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir.1993) (noting that "[t]his duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful").

To establish a claim for a failure to disclose, plaintiff must show that West possessed material information, not known by the investment managers who were responsible for the Plan's investments regarding ULLICO, and failed to disclose that information to the investment managers. See Eddy v. Colonial Life Ins. of Am., 919 F.2d 747, 750 (D.C. Cir. 1990). A key

element of this claim is that the alleged non-disclosure must be material.  See Glaziers and Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Securities, Inc., 93 F.3d 1171, 1182 (3d Cir. 1996) (stating that "a fiduciary has a legal duty to disclose to the beneficiary only those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection").

As a threshold matter, the Court must consider whether West owed a fiduciary duty to the Plan for investment decisions regarding ULLICO during the time that he was a trustee of the Plan.  In its September 20, 2005 Memorandum Opinion, the Court found that West did in fact have such a fiduciary duty notwithstanding his assertions that he had recused himself and an investment manager (first Kennedy Associates and then Columbia Partners) had sole discretion and authority over the Plan's ULLICO investment.  See Barry, 404 F. Supp. 2d at 153, 154.  The Court stands by that analysis and conclusion.  Hence, the only issues for the Court to pass upon here are: (1) whether West knew of the discretionary repurchase program and its availability to the Plan (West concedes that if he did possess this knowledge, he did not impart it to Columbia Partners or the Plan); (2) whether Columbia Partners or the Plan knew, or can reasonably be expected to have known, this information; (3) whether such knowledge would have been material to the Plan; and (4) whether plaintiff has sufficiently established that West's failure to disclose caused the Plan to suffer an actual loss.  The Court concludes that there are genuine issues of material fact regarding whether West was aware of the relevant information, whether the information would have been material to the Plan, and whether any alleged failure to disclose on the part of West caused the Plan to suffer a loss.  Summary judgment for West or plaintiff is thus precluded.

1.      *Whether West Knew of the Discretionary Repurchase Program's Existence and Availability to a Shareholder Like the Plan*.

West submits that he had no knowledge of Chairman Georgine's stock repurchases from other ULLICO officers and directors that occurred between May and November 2000, or of the repurchases from four unions that occurred after mid-January 2001 (all of which employed the $146.04 share price).  Def.'s Renewed Mot. at 9.  According to West, he asked ULLICO to repurchase his stock (mostly in August 2000) in anticipation of his impending retirement and completed a director/officer stock repurchase form for that purpose.  Id. at 10.  West concedes that he never disclosed his transaction to the Plan, but submits that he did not do so because he had no reason to believe that the Plan, as a large institutional shareholder that was financially viable, would be eligible for a similar repurchase.  Id. at 10.  West describes his transaction as fitting within the traditional criteria for discretionary repurchases, under which such transactions were only made with respect to deceased directors, retiring directors, or union shareholders experiencing financial distress.  The Plan, according to West, is an entirely different type of shareholder; therefore, he cannot have been expected to surmise that the approval of his transaction indicated the availability of similar options for the Plan.  Id. at 10, 11.

Although the record establishes that West was in attendance at the November 3, 2000 Board meeting when the Chairman introduced the resolution, it does not establish that, based upon that attendance, West knew that the Plan was eligible to participate in the discretionary repurchase program.  Plaintiff is certainly correct that the terms of the resolution establishing the discretionary repurchase program do not exclude certain types of shareholders.  To the contrary,

the resolution states that

> the Chairman . . . is hereby authorized and empowered, in his discretion, whenever he deems it consistent with sound financial practice and in the best interests of the Corporation, to repurchase shares of Class A Stock or Class B Stock . . . or Capital Stock from those shareholders offering the same to the Corporation; provided that the authorization granted . . . shall not be exercised . . . in a total amount with respect to any particular stockholder in excess of 1% of the total outstanding Stock and Capital Stock, taken in the aggregate, of the Corporation computed immediately preceding the repurchase in question . . . at such price as he shall deem appropriate; provided, however, that such price shall not be greater than that most recently specified by the Board of Directors . . . .

Def.'s Exh. 12 at 5.  But the Chairman introduced the resolution by stating that this type of discretionary repurchase program has always existed and has applied to individuals, unions, and estates.  See id. at 4.  He further stated that "it would be good to have the Board's confirmation of my authority."  Id.  In light of these statements, the Court cannot say that West's presence at the November 3, 2000 meeting establishes that he knew that a large institutional shareholder like the Plan -- neither an individual, a union, nor an estate -- could utilize the discretionary repurchase program.  Indeed, West's sworn deposition testimony asserts that he was unaware whether shareholders like the Plan were eligible for discretionary repurchases at all.  Taken together, the words used by Chairman Georgine to introduce the Board resolution and West's deposition testimony serve to rebut the reasonable inferences that flow from West's having attended the November 3, 2000 meeting and the ostensibly absolute terms of the resolution itself.[2]  Hence, there is a genuine issue of material fact regarding West's knowledge.  At the summary judgment

---

[2]The use of the minutes is not foreclosed by hearsay limitations because the statements of Chairman Georgine are not relied upon to prove the truth of the matter asserted, but rather to assess West's knowledge (or lack thereof) of those matters.  Put another way, the statements are evaluated as evidence of the effect that they can reasonably be expected to have had on West, and hence are, by definition, not hearsay.  See Fed. R. Evid. 801(c).  Although themselves hearsay, the minutes are admissible under Fed. R. Evid. 803(1) and 803(6).

stage, the Court may not choose from among conflicting pieces of evidence or make credibility

determinations.  In light of this conflicting evidence, the Court is unable to conclude that no

reasonable jury could find that West was unaware that the Plan was eligible for the discretionary

repurchase program adopted as a result of the November 3, 2000 Board meeting.

Nor does West's use of the discretionary repurchase program to redeem his own shares

establish that he knew the Plan was eligible to participate.  To be sure, the Court agrees with

plaintiff that West's contention that he tendered his shares in anticipation of his planned May

2001 retirement is questionable.[3]  His three-year appointment to the Board was not set to expire

---

[3]West only cites the Report of Special Counsel ("Thompson Report") to support his contention
that discretionary repurchases were traditionally limited to certain classes of individuals
(deceased and retiring directors) or financially-distressed unions.  As an initial matter, the Court
notes that the Thompson Report is a written, out-of-court statement that West seeks to use as
proof of the veracity of the matters addressed therein.  Hence, it constitutes hearsay.  Fed. R.
Evid. 801(c).  The Thompson Report may not fit within any of the established exceptions to the
hearsay rule, and West has never claimed that it does.  Although Rule 803(8)(c) creates an
exception for ". . . reports . . . of public offices or agencies, setting forth . . . in civil actions . . .
factual findings resulting from an investigation made pursuant to authority granted by law," this
does not encompass the Thompson Report.  The Thompson Report was produced by former
Governor Thompson in his role as a private attorney working for the law firm of Winston &
Strawn, at the request of the ULLICO Board of Directors pursuant to their decision to hire him as
Special Counsel.  Accordingly, it was not created by a public office or agency, and it was not
conducted pursuant to authority granted by law.  To be sure, some of the Thompson Report's
findings were later adopted by the majority staff of the Senate Committee on Governmental
Affairs (hereinafter "Senate Committee") and the Thompson Report was appended to the Senate
Committee's report.  But even if this were sufficient to bring the Thompson Report within the
ambit of Rule 803(8)(c), it is questionable whether the report actually supports West's
contentions.  For example, the report found that discretionary repurchases were made in 2000
from shareholders that did not fit the "traditional criteria" specified by West.  Specifically,
discretionary repurchases were made from non-retiring directors and officers who "needed the
money," "wanted to take advantage of the record-high share price," or wished "to redeem only
some of their shares, which was not permitted without proration under the formal program".
Def.'s Exh. 10 at 38.  Even the discretionary repurchases that were made before 2000 did not,
according to the Thompson Report, encompass directors like West -- rather, repurchases were
made from officers or directors who had "resigned."  Id.  West, however, did not actually resign
around the time when his shares were repurchased, in August 2000.  The Director/Officer

-11-

until May 2002.  See Pl.'s Exh. 4 at U000041.  The record further reflects that on May 8, 2001, West was appointed to a one-year term of service on the Executive Committee.  See Pl.'s Exh. 4. at U000063.  His presence or absence was duly noted in the minutes of the Board meetings until at least April 29, 2002, see Pl.'s Exh. 4 at U17423, for the Executive Committee meetings until at least May 6, 2002, see Pl.'s Exh. 5, and for the Audit Committee meetings until at least May 2, 2002, see Pl.'s Exh. 6.  Hence, although he tendered his shares in August 2000, see Def.'s Exh. 11, and notwithstanding his own deposition testimony to the contrary, it appears that West did not actually retire until May 2002; nor did he resign from his positions before then.  In light of these facts, and because nearly two years separated the date on which West utilized the discretionary repurchase program and the date on which he apparently retired, it would strain credulity to conclude on the record now before the Court that he tendered his shares in anticipation of a May 2001 retirement.

Ultimately, however, it is immaterial whether West intended to retire in May 2001 when he tendered his shares in August 2000, because West was an individual shareholder.  Chairman Georgine stated at the Board meeting of November 3, 2000 that discretionary repurchases were traditionally made from individuals, unions, and estates.  West's mere attendance at the meeting, then, cannot be viewed as providing a basis for him to suspect that the discretionary repurchase of his stock was anomalous or that the Plan -- which was neither an individual, a union, nor an estate -- could participate.  In the absence of any evidence that West was aware of discretionary

---

Request for Repurchase Form does not inquire as to the reason for the discretionary repurchase, and makes no mention of any limitations.  See Def.'s Exh. 11.  There is no independent evidence in the record to support West's contention that discretionary repurchases were "traditional[ly]" limited to deceased or retiring directors and officers or financially-troubled unions.

repurchases from shareholders that were not individuals, unions, or estates, the Court cannot say

that he was (or should have been) on notice that the Plan could benefit from the discretionary

repurchase program.

The fact remains, however, that West has not unequivocally established that pension plan

shareholders were foreclosed from participating in the discretionary repurchase program.  His

evidence in this regard (consisting of Chairman Georgine's introductory statements at the

November 3, 2000 Board meeting and a single reference in the Thompson Report) merely

suggests, by negative implication, that this might have been the case.  Simply put, neither

Chairman Georgine's remarks nor the Thompson Report affirmatively state that pension plan

shareholders were ineligible; they simply state that prior to November 3, 2000, discretionary

repurchases were made from three other types of shareholders.  In this regard, the evidence is not

even consistent -- the three classes of shareholders identified in the Thompson Report are

different from the three classes of shareholders identified by Chairman Georgine during the

Board meeting.  Furthermore, other portions of the Thompson Report make clear that, beginning

in 2000, discretionary repurchases from other types of shareholders were made.

In contrast, plaintiff has submitted the ULLICO Class A Share Ledger of May 21, 2002,

which reflects at least one discretionary repurchase from a pension plan.  See Pl.'s Exh. 13.

Although the repurchase occurred long after West's fiduciary duty to the Plan ended and involved

a share price of $46.58, see Pl.'s Exh. 13; West's Response to Pl.'s Stmt. Mat. Facts at 14-15 n.4,

this evidence nonetheless suggests that pension plan shareholders were not, as West contends,

entirely foreclosed from participating in discretionary repurchases at share prices substantially

higher than the traditional $25 threshold.  Plaintiff has also submitted evidence tending to show

that unions and pension plans were treated identically -- for example, the 50% repurchase rule

that Chairman Georgine applied to union shareholders under the discretionary repurchase

program was also applied to the pension plan repurchase reflected on the Class A Share Ledger.

Finally, the terms of the Board resolution suggest that pension plans were eligible to participate

as long as they held Class A, Class B, or Capital Stock.  The composite of plaintiff's evidence,

then, raises a genuine issue of material fact regarding whether pension plans were eligible to

participate in the discretionary repurchase program, and further serves to rebut the reasons

provided by West as a basis for his alleged lack of knowledge.  Simply put, the Court can infer

neither knowledge nor a lack thereof on the part of West based upon the record as it currently

exists.  Accordingly, summary judgment is not appropriate in favor of either party.

> 2. *Whether Columbia Partners Knew, or Should Have Known, About the Existence of the Discretionary Repurchase Program and its Availability to a Shareholder like the Plan*.

West submits that Columbia Partners already knew the information that West possessed

or, at the very least, can reasonably be expected to have known, based upon its due diligence, that

some sort of discretionary repurchase program existed.  Def.'s Renewed Mot. at 10.  This

follows, in West's view, because ULLICO disclosed individual officer and director stockholdings

to all of its shareholders in its annual proxy statements.  West claims that Columbia Partners

received the 2000 proxy report, and because Columbia Partners is a "highly qualified investment

management firm," West urges the Court to infer that it studied (or should have studied) proxy

statements from earlier years relating to "its largest single equity investment." Id. at 11.  The fact

that the Plan never expressed interest in or inquired about such transactions is, according to

West, indicative of its understanding that such transactions were not available to it. Id. at 11, 12.

The Court is not persuaded by West's arguments.  Although it is reasonable to expect that Columbia Partners studied the proxy statements for the time period during which it was responsible for managing the Plan's investments, it is an entirely different obligation to expect the investment manager to study previous proxy statements issued before it was retained with such careful scrutiny as to discover cryptic pieces of the larger corporate concealment puzzle.  West does not allege that ULLICO sent proxy statements for previous years to Columbia Partners after it was retained as the Plan's investment manager, and under such circumstances, the Court is not inclined to shift the blame to Columbia Partners.  Even if Columbia Partners had studied the earlier proxy statements, it is unlikely that those materials would unequivocally reveal the existence of the discretionary repurchase program.  To the extent that they might contain any clues at all, those clues would be implicit rather than apparent, and it would require considerable effort to divine the existence of the discretionary repurchase program.  The fact that the Plan never expressed interest in or inquired about such transactions, moreover, does not support an inference that the Plan knew it was ineligible -- that fact just as easily supports the conclusion that the Plan had no knowledge of the discretionary repurchase program at all.  A contrary conclusion might have been warranted if either Columbia Partners or the Plan had some inkling that the Chairman had authorized discretionary repurchases (regardless of the type of shareholder involved).  But as West concedes, the discretionary repurchases made prior to the adoption of the November 3, 2000 Board resolution were neither "advertise[d]" nor "encourage[d]."[4]  Def.'s Exh. 12 at 4.  The record simply contains no evidence that either Columbia Partners or the Plan knew,

[4]Here again, the Court's use of Chairman Georgine's statements is not for the truth of the matters that they assert, but rather to evaluate knowledge (or an absence thereof) of the discretionary repurchase program on the part of Columbia Partners.  See Fed. R. Evid. 801(c).

or reasonably should have known, that discretionary repurchases from any type of shareholder were ongoing, and the Court will not so lightly impute such knowledge.

      3.     *Whether Knowledge of the Discretionary Repurchase Program Would Have Been Material to the Plan.*

     West submits that, in any event, knowledge of the discretionary repurchase program would have been immaterial to the Plan because the Plan had already decided to avail itself of the formal repurchase program (under which it was obligated to tender all of its shares if it sought to tender any) by the time the Board approved the discretionary repurchase program on November 3, 2000.  Def.'s Renewed Mot. at 12.  Again, the Court disagrees.  To be sure, under the terms of the formal repurchase program, it would have been impossible for the Plan willfully to save shares to tender under the discretionary program.  Id. at 12, 13; Def.'s Exh. 8 (ULLICO's 12/14/00 Offer to Purchase) at U000222.  But the formal program contained a proration provision.  Def.'s Exh. 8 (Letter of Transmittal) at 1, 2; Def.'s Exh. 8 (ULLICO's 12/14/00 Offer to Purchase) at U000218-19.  Indeed, that provision was actually invoked by ULLICO to justify the prorated repurchase of a portion of the shares tendered by the Plan.  Hence, if the Plan had known about the discretionary program, it could have tendered the remainder of its shares and attempted to obtain redemptions at either the $146.04 share price (obtained by individuals, estates, and unions), the $46.58 share price (obtained by the American Federation of State, County & Municipal Employees Pension Plan), or some other price in excess of the traditional $25 per share offering.  The repurchase programs were not mutually exclusive, then, and knowledge of the existence of the discretionary program would have enabled the Plan to attempt to redeem more shares than it otherwise was able to redeem.

Participation in the discretionary program certainly would not have been inconsistent with Columbia Partners' fiduciary obligations to the Plan.  West claims that, as a fiduciary, Columbia Partners had a duty to act in the Plan's best interest, which would not have been served by pursuing the discretionary repurchase program because the formal repurchase program required ULLICO to purchase at least some of the Plan's shares, while the discretionary program only authorized the Chairman to repurchase shares in his discretion.  Moreover, the $146.04 share price applied to the formal repurchase program, but constituted an absolute maximum -- not a mandatory minimum -- under the discretionary repurchase program.  Def.'s Renewed Mot. at 13 n.6.  Again, this argument assumes that the formal and discretionary repurchase programs were mutually exclusive, which was not the case.  To be sure, Chairman Georgine was under no obligation to allow the Plan to take advantage of the discretionary program or to repurchase the Plan's remaining shares at the $146.04 share price.  But the Court cannot agree with West that it would have been improper for Columbia Partners at least to attempt to utilize the discretionary repurchase program to sell back more shares at a price above the traditional $25 per share offering.  The first Collins Declaration (dated January 14, 2005) does not warrant a contrary conclusion, notwithstanding its statement that Columbia Partners allegedly possessed all necessary information to make a decision regarding the repurchase plans.  See Def.'s Exh. 5 at 4 ¶ 14.  As the Court has already determined (and as the second Collins Declaration, dated April 24, 2006, makes clear) there is no evidence to suggest that Columbia Partners was aware of the discretionary repurchase program.  See Pl.'s Exh. 23 at 2-3 ¶¶ 4-8.  Accordingly, the decisions that it made related only to the formal repurchase program.  Compare Def.'s Exh. 5 with Pl.'s Exh. 23.  Even a cursory review of the first Collins Declaration reveals that the universe of

information described by Mr. Collins concerns the formal repurchase program. <u>See</u> Def.'s Exh.

5. Hence, those statements are not particularly probative regarding the discretionary repurchase

program.

4. <u>*Whether Plaintiff Has Shown that Any Alleged Breach of Fiduciary Duty by West Caused Damage to the Plan*</u>.

Finally, the Court cannot grant summary judgment in favor of plaintiff because he has not

established that any breach of fiduciary duty by West caused the Plan to suffer any loss. Under

ERISA § 409, a fiduciary is liable only for "any losses to the plan" resulting from his breach. <u>See</u>

29 U.S.C. § 1109(a). Accordingly, the Plan must at minimum establish that it suffered some loss

in order for the Court to determine whether there is a causal link between that loss and West's

alleged breach of fiduciary duty. <u>Silverman v. Mutual Benefit Life Ins. Co.</u>, 138 F.3d 98, 104 (2d

Cir. 1998) (inherently assuming a damage requirement by stating that plaintiff must establish a

nexus between the breach and the resultant loss). This causation requirement, when viewed in

light of section 409's liability limitations, suggests that the Plan must also establish that it has

suffered some reasonably quantifiable amount of damage. <u>Cf</u>. <u>Diduck v. Kaszycki & Sons</u>

<u>Contractors, Inc.</u>, 974 F.2d 270, 279 (2d Cir. 1992) (analogizing breach of fiduciary duty under

ERISA to common law fraud claims, under which speculative damages are insufficient).

Assuming for the moment that the Plan was eligible for the discretionary repurchase

program and would have participated had it known about the program's availability, there is no

assurance that the Chairman would have repurchased any shares from the Plan at all. Simply put,

the program was <u>discretionary</u>. The Chairman had full authority to decline to exercise his

discretion to repurchase tendered shares, and could determine that any proposed repurchase

would not have been in ULLICO's best interests or consistent with sound financial policy.  There was no requirement that the Chairman repurchase any shares from any shareholder, and he could have determined that because the Plan had already tendered shares under the formal repurchase program, it would not have been in ULLICO's best interests to allow the Plan, as a large institutional shareholder, to further benefit from the discretionary repurchase program.  The fact that, as plaintiff claims, other similarly-situated shareholders were permitted to benefit from both the formal and discretionary repurchase programs does not establish that the Plan would have been permitted to do so.  Alternatively, by the time the Plan actually tendered its shares under the discretionary repurchase program, it is possible that the Chairman would have made discretionary repurchases from other shareholders that proved so expensive in the aggregate that one more repurchase would not have been in ULLICO's best interests, or would have been inconsistent with sound financial policy.  It is easy to see how the inherent speculation surrounding plaintiff's alleged losses sparks a journey into the realm of "what if."

Moreover, even assuming that any breach by West caused a loss to the Plan, the amount of that loss remains, at this juncture, unsettled.  The terms of the resolution do not provide any guidance as to the number of shares that the Chairman would repurchase from a shareholder once a repurchase was approved.  The program only prohibits repurchases that exceed 1% of total outstanding stock.  Even assuming that, as plaintiff claims, other non-individual shareholders obtained repurchases for 50% of the shares tendered within the 1% limit,[5] the Chairman could

---

[5]On this point, plaintiff relies heavily upon several memoranda from the law firm Winston & Strawn, which memorialized the attorneys' recollections of witness interviews conducted as part of the investigation that culminated in the Thompson Report.  West argues that the memoranda are inadmissible hearsay, and that the summarized statements of witnesses therein amount to hearsay-within-hearsay.  According to plaintiff, the Thompson Report (which is based directly

certainly have declined to do so with respect to the Plan.  Again, this conclusion is a function of

the wide latitude conferred upon the Chairman in implementing the informal repurchase

program.

Similarly, even if the Chairman had approved a discretionary repurchase from the Plan,

and even assuming that (as plaintiff contends) the record supports a reasonable inference that the

repurchase would have consisted of 50% of the shares tendered by the Plan, the Court still cannot

ascertain with certainty what the relevant share price for the repurchase would have been.  The

$146.04 share price was, under the terms of the program, a maximum, and the Chairman could

have chosen any lower share price.  Plaintiff's evidence does not, as he claims, establish that

every shareholder who tendered shares pursuant to the discretionary repurchase program received

redemptions at the $146.04 share price.  To begin with, these documents (in the form of

ULLICO's Class A Shareholder Ledger as of May 21, 2002 (Pl.'s Exh. 13), and the draft minutes

---

upon the Winston & Strawn memoranda) has proven reliable on multiple occasions and is
admissible under at least one exception to the hearsay rule.  The Court need not determine
whether the memoranda are admissible at this juncture because, as relevant here, they simply
reiterate what is already evident from plaintiff's other evidence (including the ULLICO Class A
Share Ledger of May 21, 2002).
    Some of plaintiff's evidentiary arguments are, however, curious.  For example, plaintiff
submits that because the ULLICO board has adopted the findings and conclusions of the
Thompson Report, which flow from the Winston & Strawn memoranda, the statements are
admissible under Fed. R. Evid. 801(d)(2)(B) as admissions by party opponents.  But ULLICO is
no longer a party to this action and plaintiff does not seek to admit the Thompson Report against
ULLICO; moreover, the memoranda are statements of other directors, not of West.  Just as odd is
plaintiff's argument that the memoranda may be admitted for impeachment purposes.  To begin
with, this argument fundamentally misunderstands the Court's role at summary judgment.
Moreover, plaintiff has cited the memoranda for support that the practices and circumstances
described by the declarants are, in fact, true, not for impeachment purposes.  Finally, plaintiff's
attempt to characterize the memoranda as evidence of "the habit of [ULLICO] with respect to
purchases under the discretionary repurchase plan," Pl.'s Reply at 15, is strained because the
discretionary repurchase program was not the type of reflexive engagement or routine
undertaking that is typically considered a "habit" for hearsay purposes.

from the March 6, 2001 ULLICO Board Compensation Committee Meeting (Pl.'s Exh. 15)), only reflect repurchases that were approved and accepted -- they do not appear to show proposed repurchases that were declined or ultimately unsuccessful.  Moreover, the only evidence of a repurchase from a pension plan shareholder shows that the repurchase occurred pursuant to a substantially lower share price of $46.58.

This creates a problem for plaintiff because the Chairman, in this hypothetical scenario, could have chosen a share price so low that Columbia Partners would have determined that it would not have been in the Plan's best interest to go through with the repurchase.[6]  Moreover, because the Chairman possessed such wide latitude, the Court cannot determine with any measure of certainty which specific share price would have been offered to the Plan, notwithstanding prior practice with respect to other shareholders.  By virtue of the evidence tending to show that discretionary repurchases were, in fact, made from at least one pension plan in an amount above the traditional $25 per share price, however, plaintiff has defeated summary judgment in favor of West.  Simply put, a genuine issue of material fact remains regarding whether, absent any breach by West, the Plan would have been in a better position than it otherwise stood and, if so, how much better of a position.  These matters are ones on which the Court cannot grant summary judgment.

## CONCLUSION

For the foregoing reasons, the Court will deny defendant's motion for summary judgment with respect to Counts III and IV of the Second Amended Complaint, and will deny plaintiff's

---

[6]There is no evidence in the record to suggest that a shareholder's tender would have been irrevocable.

cross-motion for summary judgment.  A separate order has been posted on this date.

                                      /s/   John D. Bates
                                         JOHN D. BATES
                           United States District Judge

Dated:  August 29, 2006

Copies to:

Richard L. Cys
DAVIS, WRIGHT & TREMAINE, LLP
1500 K Street, NW
Suite 450
Washington, DC 20005-1272
(202) 508-6617
Fax : (202) 508-6699
Email: rickcys@dwt.com

Richard J. Birmingham
BIRMINGHAM, THORSON & BARNETT, PC
3315 Two Union Square
601 Union Street
Seattle, WA 98101
(202) 467-1240
        *Counsel for plaintiff*

Joseph Semo
FEDER SEMO & BARD, P.C.
Suite 600
1350 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8305
Fax : (202) 955-8311
Email: jsemo@federlaw.com

James E Sharp
SHARP & GROVE
Suite 475
2020 K Street, N.W.
Washington, DC 20006
(202) 467-4114
Fax : (202)467-1625

Email: jimsharp@sharpgrove.com

Jeffrey E Hartnett
BARTLEY, GOFFSTEIN, BOLLATO AND LANGE, LLC
4399 Laclede Avenue
St. Louis, MO 63108
(314) 531-1054
Fax : (314) 531-1131

William Flint Boyer
SHARP & ASSOCIATES
2020 K Street, NW
Suite 475
Washington, DC 20006
(202) 467-4114
Fax : (202) 467-1625
Email: williamboyer@sharpgrove.com

John J. Cassidy
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 293-6400
Fax : (202) 585-1084
Email: john.cassidy@bakerbotts.com

Stephen L. Braga
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7700
Fax : (202) 639-7890

S Robert Sutton
JANIS, SCHUELKE & WECHSLER
1728 Massachusetts Avenue, NW
Washington, DC 20036
(202) 861-0600
Fax : (202) 223-7230

Robert M. Weinberg
BREDHOFF & KAISER, P.L.L.C.
805 15th Street, NW

Suite 1000
Washington, DC 20005
(202) 842-2600

Joseph A Yablonski
YABLONSKI BOTH & EDELMAN
1140 Connecticut Avenue, NW
Suite 800
Washington, DC 20036
(202) 833-9060
Fax : (202) 463-6688
Email: jayablonski@ybelaw.com

Randall J. Turk
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7733
Fax : (202) 639-7890
Email: rjt@bakerbotts.com

Larry S. Gondelman
POWERS, PYLES, SUTTER & VERVILLE, PC
1875 Eye Street, NW
12th Floor
Washington, DC 20006-5409
(202) 466-6550
Fax: (202) 349-4253
Email: larry.gondelman@ppsv.com

Robert William Alexander
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, NW
Tenth Floor
Washington, DC 20005-2207
(202) 842-2600
Fax: (202) 842-1888
Email: ralexander@bredhoff.com

Jeffrey R. Freund
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, NW
Suite 1000

Washington, DC 20005-2207
(202) 842-2600
Fax: (202) 842-1888
Email: jfreund@bredhoff.com

Katherine S. Kamen
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Avenue
Suite 1200
Washington, DC 20006-5811
(202) 857-0620
Fax: (202) 659-4503
Email: ksk@groom.com
        *Counsel for defendants*