# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PADDY F. BARRY,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 02-2371 (JDB)** |
| **TRUSTEES OF THE INTERNATIONAL ASSOCIATION FULL-TIME SALARIED OFFICERS AND EMPLOYEES OF OUTSIDE LOCAL UNIONS AND DISTRICT COUNSEL'S (IRON WORKERS) PENSION PLAN, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

A bench trial in this breach-of-fiduciary-duty suit under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, is scheduled to commence on February 5, 2007. In advance of that trial, defendant Jacob West filed a motion in limine seeking to exclude three categories of documentary evidence that plaintiff plans to introduce: (1) reports issued by committees of the United States Senate and House of Representatives ("Senate Report" and "House Report"); (2) memoranda ("Winston & Strawn Memos") prepared by attorneys at the law firm of Winston & Strawn during an internal investigation of former defendant Union Labor Life Insurance Company, Inc. ("ULLICO"); and (3) the investigative report prepared by former Illinois Governor James Thompson in his capacity as chairman of Winston & Strawn ("Thompson Report"). Plaintiff, in opposing defendant's motion, has clarified that he does not intend to introduce the Thompson Report itself, but does plan to rely on at least some of the 113 exhibits attached to the report. Defendant has responded with a supplemental memorandum

challenging the admissibility of those 113 exhibits as well.  For the reasons that follow, the Court

will grant in part and deny in part defendant's motion in limine.


## BACKGROUND

The lengthy factual and procedural history of this case, which is fully set forth in two

prior opinions of the Court, will not be repeated here.  See Barry v. Trustees of the International

Ass'n of Full-Time Salaried Officers and Employees of Outside Local Unions and District

Counsel's (Iron Workers) Pension Plan, Civ. A. No. 02-2371, 2006 WL 2507557, at *1-*3

(D.D.C. Aug. 29, 2006) ("Barry II"); Barry v. Trustees of the International Ass'n of Full-Time

Salaried Officers and Employees of Outside Local Unions and District Counsel's (Iron Workers)

Pension Plan, 404 F. Supp. 2d 145, 148-50 (D.D.C. 2005) ("Barry I").  For purposes of the

present motion, it suffices to recount the information that follows.  Since the Court's ruling in

Barry I and its subsequent order granting plaintiff's motion to reconsider certain aspects of that

decision, Jacob West has been the only remaining defendant.  The only counts still pending

against West are Counts III and IV of the Second Amended Complaint, which allege that West

breached his fiduciary duties to the employee pension benefit plan ("the Plan") in which plaintiff

participates.  Specifically, plaintiff alleges in those counts that West, a director of ULLICO and a

trustee of the Plan, failed to disclose to the Plan the details of a ULLICO discretionary stock

repurchase program from which plaintiff claims the Plan could have significantly benefitted.

Barry II, 2006 WL 2507557, at *4; Barry I, 404 F. Supp. 2d at 153.

In Barry II, this Court found "that there [were] genuine issues of material fact regarding

whether West was aware of the relevant information, whether the information would have been

2

material to the Plan, and whether any alleged failure to disclose on the part of West caused the Plan to suffer a loss."  2006 WL 2507557, at *4.  The Court thus denied the parties' cross-motions for summary judgment on Counts III and IV.  In so ruling, the Court acknowledged that some of the documents on which the parties were relying presented potential hearsay problems.  See id. at *5-*9 & nn.2-5.  For instance, the Court noted that the Thompson Report "is a written, out-of-court statement that West [was seeking] to use as proof of the matters asserted therein," and that the "Report may not fit within any of the established exceptions to the hearsay rule[.]"  Id. at *6 n.3.  The Court emphasized in two other footnotes that consideration of statements by ULLICO Chief Executive Officer Robert Georgine contained in minutes from a key meeting was "not foreclosed by hearsay limitations because" those statements had not been offered to prove the truth of the matter asserted.  Id. at *5 n.2; id. at *7 n.4.

With the bench trial set to commence on February 5, 2007, West moved to bar plaintiff from introducing into evidence a number of documents, including the ones identified by the Court in Barry II, that arguably constitute hearsay.  After reviewing the parties' memoranda of law and conducting an independent review of the pertinent evidentiary rules and case law, the Court concludes that some but not all of the materials challenged by West must be excluded.  The Court further concludes, in light of plaintiff's representation that he no longer intends to introduce the Thompson Report into evidence, that defendant's challenge to the admissibility of that Report is now moot.  Finally, plaintiff's failure to identify with precision which portions of certain materials he seeks to introduce requires the Court to defer resolving some of defendant's challenges until after plaintiff provides his final exhibit list.

### DISCUSSION

The admissibility of three categories of documentary materials is currently in dispute: (1) the House and Senate Reports, (2) the Winston & Strawn Memos, and (3) the 113 exhibits attached to the Thompson Report.  Defendant contends that the documents constitute inadmissible hearsay because they are out-of-court statements "offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c), 802.  Plaintiff counters that the reports issued by the House and Senate committees are exempt from the bar against hearsay evidence as reports issued by a public office or agency.  See Fed. R. Evid. 803(8).  As to the Winston & Strawn Memos, plaintiff maintains that all of the relevant memoranda should be admitted under the residual exception to the hearsay rule, Fed. R. Evid. 807, because they are especially trustworthy and highly probative on the disputed issue of damages.  Pl.'s Opp'n at 5-6.  Plaintiff argues in the alternative that at least two memoranda, which chronicle interviews with Joseph Carabillo and John Grelle, should be admitted under Rule 803(8) because the Senate staff re-interviewed the two men and the Senate adopted "their Winston & Strawn interviews . . . as part of the factual findings of the agency."  Id. at 6.  Finally, plaintiff maintains that the exhibits to the Thompson Report are exempt from the hearsay bar as records kept in the course of regularly conducted business activities.  See Fed. R. Evid. 803(6).  For ease of analysis, the Court will address each set of materials separately, starting with the House and Senate Reports.

**A.  House and Senate Committee Reports**

Both the House of Representatives and the Senate reacted to the news of corporate malfeasance and possible director misconduct at ULLICO by initiating investigations in 2003.  In the Senate, the Committee on Governmental Affairs took the reigns, studying the Thompson

Report and a response to that report prepared by the law firm of Sidley, Austin, Brown & Wood; requesting and reviewing over fifty boxes of documents produced by ULLICO; analyzing the Winston & Strawn memos; and interviewing (or re-interviewing) key figures identified in the Thompson Report.  See Majority Staff of the S. Comm. on Governmental Affairs, 108th Cong., 2d. Sess., Self-Dealing and Breach of Duty at ULLICO, Inc. 6 (Comm. Print June 2, 2004) ("Senate Report").  The Committee also conducted a hearing on June 19, 2003.  Self-Dealing and Breach of Duty: A Review of the ULLICO Matter, Hearing before the S. Comm. on Governmental Affairs, 108th Cong., 1st Sess. (June 19, 2003), transcript and exhibits available at http://hsgac.senate.gov/_files/shrg108150ullico.pdf.  At that hearing, the Committee heard testimony from, and posed questions to, former Governor Thompson and Terence O'Sullivan, who had replaced Robert Georgine as ULLICO's Chairman and Chief Executive Officer.  Both Georgine and Chief Legal Officer Joseph Carabillo were invited to testify, but they invoked their Fifth Amendment rights against self-incrimination and declined to appear.  See id. at 3 (Opening Statement of Sen. Collins).  These investigative efforts culminated in the report at issue here, a ninety-eight-page document to which the Senate Committee appended an extensive set of exhibits.

The House Committee on Education and the Workforce pursued its own investigation at virtually the same time.  In March of 2003, the Committee sent Georgine a letter requesting the production of documents and records in connection with the investigation into the actions of ULLICO's Board of Directors.  See H. Comm. on Education and the Workforce, 108th Cong., 1st Sess., Report on Investigation of ULLICO, Inc., Apx. A (Comm. Print Oct. 14, 2003) ("House Report").  A follow-up letter sent less than two weeks later reiterated the Committee's demand

for a copy of the Thompson Report, which, according to media reports, ULLICO had agreed to release to the public in the interim.  <u>See</u> House Report, Apx. B.  These requests yielded approximately 95,000 pages of documentary evidence, including the Thompson Report.  House Report at 1.  As the Senate did, the House Committee convened a hearing in June of 2003.  <u>Id.</u>, Apx. E (<u>The ULLICO Scandal and its Implications for U.S. Workers</u>, Hearing before the H. Comm. on Education and the Workforce, 108th Cong., 1st Sess. (June 17, 2003)).  Georgine, summoned by a subpoena, invoked his Fifth Amendment right and refused to testify.  <u>Id.</u>, Apx. E at 10.  The House Committee thus heard testimony from only (1) a local lawyer with an expertise in pension fund and fiduciary matters, and (2) the counsel to ULLICO's Chairman of the Board.

The hearing also provided an opportunity for the House Committee members to assail the conduct of ULLICO's former directors and for minority members to chide their counterparts in the majority for failing to investigate other highly publicized corporate scandals with the same vigor they had shown in pursuing the ULLICO matter.  <u>See, e.g.</u>, Apx. E at 2 (Rep. Boehner) (noting that the Committee was prompted to act by facts suggesting that "at the same time organized labor was decrying corporate wrongdoing and corporate greed, many of the leaders of the same unions were, in fact, themselves profiting at the expense of rank and file union members and their families"); <u>id.</u> at 4 (Rep. Miller) ("Frankly, I wish the majority was as interested in investigating the billions of dollars employees lost in company 401(k) plans due to corporate fraud and abuse as it is in investigating the ULLICO transactions.").  Indeed, ranking member Congressman George Miller went so far as to include in the House Committee report a summary of the minority's views on the issues, in which he noted that "[t]he Minority was never asked or permitted to participate in preparing the report."  House Report at 306.  The fruit of the

House Committee's labors - - a thirteen-page report that largely borrowed its factual findings and legal conclusions from the Thompson Report - - was likewise a far cry from the final product released by the Senate.  One reason for the difference between the two reports may well have been time; whereas the House completed its report on October 14, 2003, the Senate did not do so until June of 2004.

With this sketch of the Congressional reports in mind, the Court turns to the governing legal framework.  Assuming that plaintiff would introduce the House and Senate Reports to demonstrate the truth of the factual findings and conclusions set forth therein, the reports constitute hearsay and are inadmissible unless they fall within one of the exceptions enumerated in the Federal Rules of Evidence.  See Fed. R. Evid. 802.  Plaintiff argues that the reports are admissible under Rule 803(8), which exempts from the bar on hearsay evidence

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

More specifically, plaintiff seeks to admit the Congressional reports under the last clause of this rule, one that applies in civil actions to "reports . . . of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law."  Fed. R. Evid. 803(8)(C).

The Supreme Court authoritatively construed Rule 803(8)(C) in Beech Aircraft Corp. v. Rainey, 488 U.S. 169 (1988).  In that case, the Court resolved a circuit split as to the breadth of

the phrase "factual findings."  Examining the language of the rule, the Advisory Committee

Notes, and the legislative history, the Court rejected the narrow view that any opinions and

conclusions that accompany findings of fact in a report or record are excluded from the purview

of Rule 803(8)(C).  Id. at 162-70.  The Court held "that portions of investigatory reports

otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a

conclusion or opinion."  Id. at 170.  Rather, the Court explained, the Advisory Committee

assumed that all portions of qualifying evaluative reports would be admissible "unless the

sources of information or other circumstances indicate lack of trustworthiness."  Id. at 167 (citing

Fed. R. Evid. 803(8)(C) and Advisory Committee Notes).  This trustworthiness requirement,

along with the "safeguards" of relevance (Rule 401) and prejudice (Rule 403) that are already

"built into the Federal Rules," provides sufficient means for trial courts to exclude from evidence

problematic portions of public reports.  Id. at 167-68.  Accordingly, so long as the conclusions or

opinions in a report are "based on a factual investigation and satisf[y] the Rule's trustworthiness

requirement, [they] should be admissible along with other portions of the report."  Id. at 170.

Beech Aircraft and the Advisory Committee Notes establish that Rule 803(8)(C) assumes

admissibility in the first instance.  Id. at 167 (quoting Advisory Committee Notes).  Hence, the

party challenging the admissibility of a public or agency report - - here, defendant West - - bears

the burden of demonstrating that the report is not trustworthy.  See In re Korean Air Lines

Disaster of Sept. 1, 1983, 932 F.2d 1475, 1482 (D.C. Cir. 1991); Moss v. Ole South Real Estate,

933 F.2d 1300, 1305 (5th Cir. 1991); Fayson v. Schmadl, 126 F.R.D. 419, 420 (D.D.C. 1988).

The Advisory Committee suggested, and the Supreme Court has endorsed, "a nonexhaustive list

of four factors" to assist courts in assessing a report's trustworthiness.  See Beech Aircraft, 488

8

U.S. at 167 n.11.  Those four factors are: (1) the timeliness of the investigation; (2) the special skill or expertise of the investigating official; (3) whether a hearing was held and the level at which it was conducted; and (4) possible motivation problems, as suggested by the Supreme Court in Palmer v. Hoffman, 318 U.S. 109 (1943).  Although other courts have formulated and applied additional factors, see Coleman v. Home Depot, Inc., 306 F.3d 1333, 1342 & n.4 (3d Cir. 2002) (describing seven other factors used by the district court in Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd., 505 F. Supp. 1125, 1147 (E.D. Pa.1980)), the four mentioned above are the only ones listed by the Advisory Committee and cited with approval by the Supreme Court.

In weighing these four factors, courts must take care not to confuse the trustworthiness of a report with the credibility of the findings or conclusions contained therein.  See Moss, 933 F.3d 1306-07.  The Fifth Circuit has usefully advised courts not to "focus on questions regarding the accuracy or completeness of the document's conclusions." Id. at 1307.  Instead, that court explained, "the focus is the report's reliability," which requires a determination primarily of "whether the report was prepared or compiled in a way that indicates that its conclusions can be relied upon[.]"  Id.  Hence, courts faced with a challenge to the trustworthiness of an evaluative public report should examine the manner in which the report was prepared, not "whether the court agrees with the conclusions of the report." Id.  Doubts about the completeness or accuracy of the report go to "'the weight of th[e] evidence and not its admissibility.'" Id. (quoting Matador Drilling Co. v. Post, 662 F.2d 1190, 1199 (5th Cir. 1981)).  This focus on methodology rather than credibility, see Moss, 933 F.2d at 1308 ("Whether evaluative reports do in fact [present the common] hearsay dangers is most often a question of methodology, not a question of

credibility."), recognizes that the presumed trustworthiness of public reports "does not necessarily reside in the contents of th[ose] records, be they facts or conclusions, but rather in their source."  United States v. Am, Tel. & Tel. Co., 498 F. Supp. 353, 360 (D.D.C. 1980).

There is, however, surprisingly little guidance on the admissibility of public reports that have as their "source" a Congressional committee.  See id.  For one thing, the language of the rule does not single out Congressional reports or distinguish them from Executive agency reports.  Outside of the requirements that the report set forth factual findings and be reliable, the only textual limitation in Rule 803(8)(C) is that the report's findings and conclusions "result[] from an investigation made pursuant to authority granted by law."  The Advisory Committee Notes likewise make no mention of reports issued as the result of a Congressional investigation.  And as far as this Court is aware, none of the federal courts of appeals, let alone the D.C. Circuit, has set forth specific principles for assessing trustworthiness in the context of Congressional reports beyond the general trustworthiness inquiry established by the Advisory Committee Notes.  See Baker v. Firestone Tire & Rubber Co., 793 F.2d 1196, 1199 (11th Cir. 1986) (upholding district court's exclusion of a House subcommittee report on the ground that the report "consisted of the rather heated conclusions of a politically motivated hearing" and thus lacked trustworthiness); Bright v. Firestone Tire & Rubber Co., 756 F.2d 19, 22-23 (6th Cir. 1984) (concluding that "[t]he unverified nature of the evidence relied on by the [House] Committee was sufficient reason for the District Court to find in its discretion that the report is not trustworthy enough to be admissible").  The few courts to face challenges to the admissibility of Congressional reports have instead applied the general framework on a case-by-case basis, hewing closely to the particular report (or portion thereof) before them.

Fortunately, some common themes emerge from the decisions in this area.  One theme is that Congressional reports are not entitled to an additional presumption of trustworthiness or reliability - - beyond the one already established in the Advisory Committee Notes - - simply by virtue of having been produced by Congress.  To the contrary, a number of cases, including one in this district, have declined to admit Congressional reports under Rule 803(8)(C).  See Pearce v. E.F. Hutton Group, Inc., 653 F. Supp. 810, 813-15 (D.D.C. 1987) (excluding House committee report that was prepared as part of the committee's oversight responsibilities, from which the minority members dissented, and that failed "to isolate or distinguish any factual findings from its subjective criticisms and conclusions"); see also Richmond Medical Ctr. v. Hicks, 301 F. Supp. 2d 499, 512 (E.D. Va. 2004) (declaring inadmissible sections of House reports and exhibits attached thereto in a challenge to the constitutionality of a law criminalizing certain abortion procedures), aff'd, 409 F.3d 619 (4th Cir. 2005); Anderson v. City of New York, 657 F. Supp. 1571, 1577-79 (S.D.N.Y. 1987) (declaring a subcommittee report to be unreliable and hence inadmissible based on the four-factor test and the court's view that the committee engaged in grandstanding and heard testimony from interested parties, not objective experts).  These courts have based their decisions in part on the possibility that partisan political considerations, as well as elected officials' tendency to "grandstand," have influenced the factual findings, conclusions, or opinions included in Congressional reports.  See Richmond Medical Ctr., 301 F. Supp. 2d at 512 (granting a motion to strike a House report that "represents[ed] the political position of the representatives who voted for it"); Anderson, 657 F. Supp. at 1579 (emphasizing that hearings and reports "are frequently marred by political expediency and grandstanding"); Pearce, 653 F. Supp. at 814 (observing that Congress is a "politically-motivated, partisan body,"

and expressing concern that "political considerations might affect the findings of" the House report at issue).

A second factor emphasized by these courts is whether members of both parties joined in the report, or whether the report was filed over the dissent of the minority party.  Where the former has occurred, thus demonstrating less partisan rancor and a higher level of solemnity, courts have been more likely to reject challenges to the admissibility of Congressional reports. Compare McFarlane v. Ben-Menashe, No. 93-1304, 1995 WL 129073, at *4-*5 (D.D.C. March 16, 1995) (admitting the report of a joint Congressional task force in which members of both parties joined), reconsideration granted on other grounds, 1995 WL 799503 (D.D.C. June 13, 1995); and Hobson v. Wilson, 556 F. Supp. 1157, 1181 (D.D.C. 1982) (admitting committee report that "reflected adherence to appropriate standards of scholarly responsibility, investigative integrity, and trustworthiness"), aff'd in part, rev'd in part, 757 F.2d 1 (D.C. Cir. 1984); with Pearce, 653 F. Supp. at 815 (excluding House committee report "that was hotly disputed and dissented to directly along party lines"); and United Airlines, Inc. v. Austin Travel Corp., 867 F.2d 737, 742-43 & n.3 (2d Cir. 1989) (upholding district court's exclusion of House committee report from which eleven members dissented).  This consideration of party-line voting reflects both the reality of the political process and the intuitive notion that reports that are truly reliable on a methodological and procedural level are less likely to provoke bitter divisions than those that have politics, rather than policy or truth-seeking, as their ultimate objective.

The question now before this Court is whether West has overcome the presumptive admissibility of the Senate and House Reports by identifying "sufficient negative factors" to call into question the trustworthiness of those reports.  See Advisory Committee's Notes.  West's

primary argument is that the Congressional reports' reliance on the Thompson Report and the

Winston & Strawn Memos, which themselves constitute hearsay, undermines the presumption of

trustworthiness and thus admissibility to which the reports would otherwise be entitled.  See

Def.'s Motion at 7; Def.'s Supp'l Mem. at 2-3.  As West sees it, "the Reports simply re-package -

- in a different format - - the investigation conducted by Former Governor Thompson and the law

firm of Winston & Strawn."  Id. at 3.  With respect to the four factors identified by the Advisory

Committee, West insists that the Congressional reports cannot be deemed "timely" because they

were released two or three years after the last relevant actions in this case occurred, and that the

aforementioned reliance on the Thompson Report dispels the notion that the reports were a

product of Congress's investigatory skills.  Def.'s Reply at 6.

West's arguments, though not without force, fail to appreciate critical distinctions

between the Senate and House Reports.  Indeed, West overstates both the breadth of the Senate

Report's reliance on the Thompson Report and the significance of that reliance in the

trustworthiness inquiry.  The Senate Report is not, as West contends, simply a reproduction of

the Thompson Report or the Winston & Strawn Memos.  Rather, that report begins by setting

forth at some length the investigative steps that the Governmental Affairs Committee and its staff

undertook in preparing the report.  Those activities included reviewing the very documents upon

which both Winston & Strawn and Sidley Austin (in its response to the Thompson Report)

relied, interviewing or re-interviewing key figures like Chief Legal Counsel Joseph Carabillo and

CFO John Grelle, and conducting a public hearing at which senators had the opportunity to

question former Governor Thompson and ULLICO CEO Terence O'Sullivan.  See Senate Report

at 6.  Moreover, the investigative activities that supplemented the steps already undertaken by the

private law firms contributed in important ways to the content of the Senate Report, as is evident from the report's repeated citation to, among other sources, staff interviews of Carabillo and Grelle.  <u>See</u> Senate Report at 34 & nn.151-154; <u>id.</u> at 35 & n.158; <u>id.</u> at 38 & nn.185-87; <u>id.</u> at 41 & n.11; <u>id.</u> at 46 & nn.238-42.  The written report thus reflects a carefully prepared, balanced, and hyperbole-free recitation of all of the available information.  As such, the fact that the Senate Report relied on and cited to the Thompson Report and the Winston & Strawn Memos does not divest it of the level of trustworthiness necessary for admission under Rule 803(8)(C).

The four considerations suggested in the Advisory Committee Notes lead to the same conclusion.  With respect to "the timeliness of the investigation," West stresses that the Congressional investigations did not commence until approximately two years after the events relevant to this case had transpired.  <u>See</u> Def.'s Reply at 6.  But that strict focus on the time that had passed once again oversimplifies what was a complex process with multiple fronts.  More importantly, the passage of time in no way detracts from the report's reliability.  The Congressional investigations started less than a year after a federal grand jury's investigation into ULLICO became public, within six months of the completion of the Thompson Report, and shortly after media reports revealed the existence of that report and its transmittal to ULLICO's Board of Directors.  <u>See</u> Senate Report at 7-8; House Report at 2; <u>id.</u>, Apx. B (March 21, 2003 Letter from Rep. Boehner to Georgine).  Nothing about this chronology, which is far from a plodding legislative pace, suggests that memories or perceptions had faded - - two of the main concerns underlying the hearsay rules.  <u>See</u> <u>Moss</u>, 933 F.2d at 1308.  Indeed, another judge in this district has found that a Congressional report prepared twelve years after the events at issue occurred was reliable and admissible under Rule 803(8)(C), where the Congressional task force

"had direct access to voluminous documents" and independently determined whether the evidence was corroborated and had probative value.  See McFarlane, 1995 WL 129073, at *5. The Senate Committee here similarly had access to large volumes of records and independently evaluated those records in crafting its final report.  Hence, as in McFarlane, Congress's failure to act immediately after the events at issue does not undermine the report's reliability.

West's challenge to the skill or expertise of the investigating officials, the second Advisory Committee factor, is similarly misplaced.  As explained above, the Senate brought considerable experience and resources to bear in an investigation that at the very least corroborated, rather than replicated, the thorough efforts previously undertaken by former Governor Thompson's team.  The third factor, whether a hearing was held and the nature of that hearing, also militates in favor of trustworthiness.  Although the parties do not cite to the Senate hearing in their filings, the Court has independently reviewed the hearing transcript and is satisfied that the Senators treated the investigation as one of utmost importance and tailored their questions and their demeanor accordingly.  Finally, defendant has not pointed to anything in either the Senate Report or the hearing that would indicate that the report was prepared primarily or even partially to assist in ongoing ULLICO-related litigation - - the type of "motivation problems" that the Supreme Court noted in Palmer v. Hoffman, 318 U.S. 109, 113 (1943).

This final point, the absence of any motivation problems, also overlaps with the two factors that other courts have identified in declining to admit Congressional reports under Rule 803(8)(C).  As explained above, those courts focused on (1) whether the findings and conclusions in a Congressional report are the product of serious investigation rather than political grandstanding, and, relatedly, (2) whether members of the minority party refused to join in the

report or otherwise noted their dissent.  See Pearce, 653 F. Supp at 814-15; Richmond Medical

Ctr., 301 F. Supp. 2d at 512; McFarlane, 1995 WL 129073, at *4-*5; Anderson, 657 F. Supp. at

1577-79.  The Senate Report does not suffer from either of these flaws.  For one thing, both the

tone and the content of the report demonstrate a careful, methodical investigation that eschewed

hasty conclusions and inflammatory rhetoric.  This impression is confirmed by the statements of

the Senators during the hearing, where the ranking minority member (Senator Levin) opened by

praising the Committee Chairperson for conducting the "investigation and hearing . . . in a very

fair and very thorough way."  Self-Dealing and Breach of Duty: A Review of the ULLICO

Matter, Hearing before the S. Comm. on Governmental Affairs, 108th Cong., 1st Sess. (June 19,

2003), at 4.  And as these words already intimate, the Democratic minority, in stark contrast to its

counterparts in the House of Representatives, did not dissent from the findings and conclusions

of the report.  See Pearce, 653 F. Supp. at 815; United Airlines, 867 F.2d at 742-43 & n.3.  The

Senate Report, in short, is not beset by either of the reliability problems that courts have

identified with respect to other Congressional reports.  Hence, this Court concludes that the

Senate Report is trustworthy and admissible as an exception to the hearsay bar under Fed. R.

Evid. 803(8)(C).[1]

   The Court reaches the opposite conclusion with respect to the House Report.  That report

---

[1]  The Court recognizes that documents that qualify for admission under Rule 803(8) may nevertheless be excluded under Rule 403 on the ground that the probative value of the documents is substantially outweighed by their prejudicial effect on the adverse party or the proceedings. See 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.10[1] (2d ed. 2006); Pearce, 653 F. Supp. at 816-17.  Although defendant has not made any argument based on Rule 403 here, the Court has conducted the necessary inquiry and finds that introducing portions of the Senate Report would not prejudice defendant, confuse the issues, or mislead the factfinder - - in this case, the Court.  Indeed, the fact that trial in this case is to the Court, not a jury, minimizes any potential risks of admitting portions of the Senate Report.

contains few of the virtues of its Senate counterpart and many more vices.  The thirteen-page

document was prepared with considerable haste, borrows extensively (if not exclusively) from

the Thompson Report, and reaches tentative legal conclusions without appreciable analysis.

Even these tentative conclusions, moreover, failed to garner the support of the minority members

of the Committee, who filed a separate five-page document setting forth their views.  House

Report at 305.  Ranking Democrat George Miller noted that Democrats on the Committee were

"never asked or permitted to participate in preparing the report."  Id. at 306.  Party-line divisions

were likewise evident at the Committee hearing, where representatives turned up the rhetoric and

engaged in the kind of soliloquies that have prompted courts' concerns about political

"grandstanding."  See Anderson, 657 F. Supp. at 1579.  Given the House Report's failure to

explore or expand upon the Thompson Report and the indications of a strongly partisan

foundation, the Court finds that defendant has carried his burden of demonstrating that the House

Report is not sufficiently trustworthy for admission under Rule 803(8)(C).  Defendant's motion to

exclude the House Report will therefore be granted.

Two additional arguments advanced by defendant in his motion and supplemental

memorandum warrant a clarification of the Court's decision with respect to the Senate Report.

Specifically, the Court's ruling that the Senate Report is admissible under Rule 803(8)(C) does

not necessarily mean that all ninety-eight pages of the report will be introduced into evidence, as

West fears.  See Def.'s Supp'l Mem. at 4.  The Supreme Court in Beech Aircraft expressly

recognized that other "safeguards" in the Federal Rules of Evidence, relevance and potential

prejudice foremost among them, provide trial courts "with additional means of scrutinizing and,

where appropriate, excluding evaluative reports or portions of them."  488 U.S. at 167-68.

17

Defendant's argument that large swaths of the Senate Report are irrelevant, if well taken, would thus unquestionably limit the "portions" of the report that plaintiff could successfully introduce into evidence.  Such speculation remains premature at this stage, however, because plaintiff has not identified specific portions of the Senate Report that he believes are relevant and probative on the narrow issues left for trial.  Accordingly, the Court will not take up defendant's relevance challenge until the parties have submitted their final exhibit lists, which are not yet due under the scheduling order governing this case.  The soundest course under these circumstances, in the Court's view, is to defer consideration of any relevance-based challenge to the Senate Report until after receiving the parties' final exhibit lists, in which the specific portions of documents offered as evidence must be identified.

There is also another potentially significant limitation on the admissibility of certain portions of the Senate Report.  As defendant points out, the report includes many additional out-of-court statements that are themselves hearsay, and thus presents instances of double or even triple hearsay.  See, e.g., Senate Report at 1 (" ULLICO's Chief Legal Officer Joseph Carabillo said that Robert Georgine instructed him never to disclose information about executive compensation unless legally required to do so.").  These other hearsay statements are admissible only "if each part of the combined statements conforms with an exception to the hearsay rule provided in" the Federal Rules of Evidence.  Fed. R. Evid. 805; see also 5 Weinstein's Federal Evidence § 803.10[4][a] ("Statements made by third persons that are recorded in an investigative report are hearsay within hearsay.  As such, they are inadmissible unless they qualify for their own exclusion from the hearsay rule[.]").  Again, however, the Court cannot determine whether plaintiff will seek to introduce, for the truth of the matters asserted therein, the particular

examples cited by defendant and whether the statements at issue qualify as exceptions to the hearsay bar under the Federal Rules.  Hence, even if defendant's argument is generally correct and some portions of the Senate Report will later be deemed inadmissible, the Court will not exclude the entire report at this stage.

## B.  Winston & Strawn Memoranda[2]

Plaintiff seeks to introduce the Winston & Strawn Memos, which chronicle attorneys' interviews with key ULLICO directors and employees, under the residual hearsay exception codified as Fed. R. Evid. 807.  Pl.'s Opp'n at 5.  These Memos, plaintiff maintains, would be introduced not "to establish a fiduciary breach by Mr. West, but rather to establish the practice and procedures of ULLICO with respect to repurchases under the discretionary repurchase plan for purposes of determining damages."  Id.  And the Memos are particularly reliable, plaintiff claims, because: the investigators were skilled; the interviewees were represented by counsel; the statements reported in the Memos were never corrected by the interviewees, ULLICO, or the law firm of Sidley Austin when it reviewed the Thompson Report; and the content of the interviews as portrayed in the Memos is consistent with the Senate and House Reports.  Id. at 5-6.

Rule 807, the so-called residual exception to the hearsay bar, authorizes courts to admit

---

[2] Almost as an afterthought, plaintiff argues that defendant has waived any challenge to the admissibility of the Winston & Strawn Memos by purportedly relying on those very Memos in an earlier filing.  Pl.'s Opp'n at 6.  In support of this contention, plaintiff cites to one of his submissions in advance of the decision in Barry II.  See Pl.'s Reply to West's Opp'n to Pl.'s Motion for Summary Judgment, dkt. # 141.  That filing explains that one paragraph in defendant's statement of material facts (¶ 15) included a citation to a page in the Thompson Report, which in turn relied on the Winston & Strawn Memos.  The Court declines to treat defendant's isolated and once-removed reliance on the Memos as a waiver, either intentional or inadvertent, of his ability to challenge the admissibility of those Memos at this stage of the litigation.  This aspect of defendant's motion in limine will therefore be evaluated on the merits.

hearsay statements that do not fall under one of the exceptions enumerated in the rules.  Such a statement may be admitted so long as the opposing party is on notice, the statement "ha[s] equivalent circumstantial guarantees of trustworthiness," and

> the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence[.]

Fed. R. Evid. 807.  The D.C. Circuit has explained that this catch-all exception is "extremely narrow and require[s] testimony to be very important and very reliable."  United States v. Washington, 106 F.3d 983, 1001 (D.C. Cir. 1997) (citation and quotation marks omitted); see also United States v. Kim, 595 F.2d 755, 765-66 (D.C. Cir. 1979) (emphasizing that the residual exception is to be given a "narrow construction" and is appropriate "only in exceptional circumstances").  Given that the exception is to be used "sparingly," "the proponent of the statement bears a heavy burden to come forward with indicia of both trustworthiness and probative force."  Washington, 106 F.3d at 1001-02; see also Bell v. Gonzales, Civ. A. No. 03-0163, 2005 WL 3555490, at *7 (D.D.C. Dec. 23, 2005).

The party seeking to invoke the residual exception must demonstrate that the material offered satisfies each of the five requirements contained in Rule 807.  See 2 McCormick On Evidence § 324 (6th ed.).  Two of these - - Fed. R. Evid. 807(A) and (C) - - are simply restatements, respectively, of the relevance standard contained in Rule 401 and the general purpose of the Federal Rules explained in Rule 102.  See id.  A third criterion, that the adverse party have a "fair opportunity" to prepare a response to the evidence, is not contested here.  What is disputed is whether plaintiff has satisfied the two main requirements - - that the statement both

20

offers "'equivalent circumstantial guarantees of trustworthiness' to those found in the various

other specific hearsay exceptions," and is "'more probative on the point for which it is offered

than any other evidence the proponent can procure through reasonable efforts.'"  Id. (quoting Fed.

R. Evid. 807).  The first of these two requirements "depends [] heavily upon a judgment of

reliability," the determination of which falls with the trial court's broad discretion.  See Sec. &

Exch. Comm'n v. First City Financial Corp., Ltd., 890 F.2d 1215, 1225 (D.C. Cir. 1990); 5

Weinstein's Federal Evidence § 807.03[2][a].  Courts have interpreted the second principal

requirement "as providing a basis for a trial court to evaluate the need for the statement in the

case as compared to the costs of obtaining alternative evidence," or "as imposing a requirement

of diligence."  2 McCormick On Evidence § 324; see also Bortell v. Eli Lilly and Co., 406 F.

Supp. 2d 1, 10-11 (D.D.C. 2005) (reading the "through reasonable efforts" language of Rule 807

as imposing a diligence-type requirement).

Under this framework, plaintiff has failed to carry his burden of demonstrating that the

Winston & Strawn Memos qualify for the "extremely narrow" exception embodied in Rule 807.

See Washington, 106 F.3d at 1001.  Defendant correctly points out that each Memo begins with

the disclaimer that it "is not intended to be a verbatim record of [the] discussions but, instead,

contains a summary of [the attorneys'] recollections, mental impressions and observations[.]"

Def.'s Motion at 3.  In addition, the disclaimer indicates that "[t]he topics are not necessarily

addressed . . . in the order in which they were discussed in the interview."  Def.'s Exh. 1

(BK 03988).  This opening disclaimer both highlights that the words used in the Memos are not

the exact ones employed by the speakers and raises the possibility that the context in which the

reader reads a statement may be different from the context in which the speaker made the

statement.  When combined with the fact that the Memos contain multiple instances of hearsay-within-hearsay, these two characteristics undermine any quantum of reliability that the factors identified by plaintiff may have conferred upon the Memos.  Put differently, plaintiff has not demonstrated that, under the "totality of the circumstances," the Memos provide guarantees of trustworthiness equivalent to those contained in the specific hearsay exceptions already recognized under the Federal Rules.  See 5 Weinstein's Federal Evidence § 807.03[2][b].

But even if plaintiff could satisfy this initial requirement, he has failed to establish that the Winston & Strawn Memos are "more probative on the point for which [they are] offered than any other evidence which [he] can procure through reasonable efforts."  See Fed. R. Evid. 807(B).  In arguing to the contrary, plaintiff contends that the Memos are "more probative than other evidence on the issue of damages," principally because the Memos "were recorded at a point in time when the details of the discretionary repurchases and the conduct of ULLICO . . . were still fresh in the minds" of the witnesses.  Pl.'s Opp'n at 6.  Plaintiff's brief, however, notably omits from its recitation of the Rule 807 standard the requirement that the evidence offered be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts."  Fed. R. Evid. 807(B) (emphasis added).  The emphasized language, whether read as imposing a necessity or a diligence requirement, dooms plaintiff's argument.  See 2 McCormick On Evidence § 324.  Indeed, plaintiff has not explained why, given the information in the Senate Report and the potential live testimony from Carabillo (who is included on the witness lists of both parties), his need to introduce the Memos is so strong as to make this one of the "exceptional cases" in which Rule 807 permits the introduction of evidence that would otherwise be inadmissible hearsay.  See Kim, 595 F.2d at 765.

To the extent that Rule 807(B) imposes a diligence requirement, plaintiff's argument is even weaker.  Although he has known since early in this litigation that Carabillo and Grelle could provide crucial testimony, plaintiff failed to depose them or to seek through discovery other sources for the information contained in the Winston & Strawn Memos.  As another judge of this court has found, a party's failure "to expend reasonable efforts to obtain properly admissible evidence" constitutes a failure to satisfy the requirement imposed by Rule 807(B).  See Bortell, 406 F. Supp. 2d at 10 (declining to admit affidavits under Rule 807 where the proponent of the evidence knew two witnesses who became unavailable were elderly, but failed "to preserve their testimony for trial").  Likewise, plaintiff here has not shown that, "through reasonable efforts," he could not have otherwise obtained the information that he now seeks to introduce via evidence that is unquestionably hearsay (and hearsay-within-hearsay).  The Court therefore concludes that the Winston & Strawn Memos are not admissible under Rule 807.

As an alternative to across-the-board admission of the Memos, plaintiff maintains that a limited number of the Memos, which recount the Winston & Strawn attorneys' interviews with Carabillo and Grelle (see Def.'s Motion Exh. 1 (BK 3988-4015)), are admissible as public records under Rule 803(8).  This is so, plaintiff says, because "these individuals were re-interviewed by the Senate Governmental Affairs Committee staff and their Winston & Strawn interviews were adopted as part of the factual findings of the agency."  Pl.'s Opp'n at 6 (citing Moss, 933 F.3d at 1305).  There are several flaws in this argument,[3] the principal one of which is that plaintiff has not explained the basis for his claim that the Senate Report adopted as its own

---

[3] One basic (though perhaps insignificant) flaw is that the Senate Committee is not, as plaintiff submits, "an agency."

the Winston & Strawn interviews with Carabillo and Grelle.  This Court's review of the Senate

Report confirms that the Committee cited the Winston & Strawn interviews <u>and</u> its own

interviews with both men, going so far as to note at the outset that Carabillo "imposed an

artificial limit on the length of the interview, which prevented a complete examination on all the

relevant issues."  Senate Report at 6 n.3.  If being cited in the Senate Report is enough to qualify

a memorandum summarizing a pre-existing interview as a public record or report under Rule

803(8), then every Winston & Strawn Memo cited therein would be admissible under that rule,

and there would be no need for plaintiff to press - - and the Court to consider - - admissibility

under the residual exception.  Accordingly, the Court rejects plaintiff's attempt to recast the

Winston & Strawn Memos that summarize interviews with Carabillo and Grelle as public records

or reports.

    As was the case with the Congressional reports, one cautionary note is in order.  The

Court's ruling that plaintiff has not demonstrated that the Winston & Strawn Memos are

admissible under Rule 807 or Rule 803(8) stems in part from plaintiff's failure to identify which

Memos, outside of those summarizing the Carabillo and Grelle interviews, he intends to

introduce at trial.  If plaintiff identifies specific Memos and demonstrates that those Memos

satisfy the Rule 807 requirements, the Court will apply this aspect of its ruling on a document-

by-document basis.  For now, however, the Court reaffirms its conclusion that the Winston &

Strawn Memos do not fit within the "extremely narrow" bounds of Rule 807 and are accordingly

inadmissible at trial.  <u>See</u> <u>Washington</u>, 106 F.3d at 1001.

## C.  Exhibits to the Thompson Report

    Plaintiff has now renounced his earlier intention of introducing into evidence the

Thompson Report, rendering the corresponding aspect of defendant's motion in limine moot.  On

the other hand, plaintiff now intends to rely on some of the 113 Exhibits attached to the

Thompson Report.  Those exhibits, plaintiff maintains, are exempt from the bar against hearsay

evidence because they qualify as business records under Rule 803(6) of the Federal Rules of

Evidence.  That exception to the hearsay bar generally allows courts to admit documents that

record "acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from

information transmitted by, a person with knowledge, if kept in the course of a regularly

conducted business activity, and if it was the regular practice of that business activity to make the

memorandum, report, record or data compilation."  Fed. R. Evid. 803(6).  Business records must

be properly authenticated by a qualified witness or in accordance with other provisions of the

Federal Rules, and may be excluded "if the source of information or the method or circumstances

of preparation indicate lack of trustworthiness."  Id.; see also United States v. Gurr, - - F.3d - - ,

2006 WL 3526690, at *5-*6 (D.C. Cir. Dec. 8, 2006).  "The structure of [Rule 803(6)] places the

initial burden on the proponent of the document's admission to show that it meets the basic

requirements of the rule, and the 'unless' clause then gives the opponent the opportunity to

challenge admissibility, albeit now bearing the burden of showing a reason for exclusion."  2

McCormick On Evidence § 288; see also Shelton v. Consumer Products Safety Comm'n, 277

F.3d 998, 1010 (8th Cir. 2002).

As with defendant's relevance-based challenge to the Senate Report, however, the Court

cannot rule on the applicability of the business-records exception without knowing which

specific exhibits plaintiff seeks to introduce.  Plaintiff acknowledged at the initial pretrial

conference that he did not intend to introduce all 113 of the exhibits; certainly they are not all

relevant to this proceeding.  But defendant persuasively argues, and the Court agrees, that

plaintiff has made "no effort to explain <u>why</u> the individual 113 exhibits to the [Thompson]

Report qualify as business records."  Def.'s Reply at 5.  The absence of such an explanation has

deprived defendant of an opportunity to contest the applicability of the business-records

exception and has likewise deprived the Court of the benefits conferred by adversarial testing of

the relevant issues, including the threshold question of relevance with respect to each document.

Once again, therefore, the Court must await plaintiff's final exhibit list - - and an explanation of

that list's contents - - before determining whether, for specific exhibits, he has met his initial

"burden of establishing the foundational requirements of the business records exception."  <u>See</u>

<u>Shelton</u>, 277 F.3d at 1010.[4]  If plaintiff does so, then the burden will shift to defendant "to prove

inadmissibility by establishing sufficient indicia of untrustworthiness."  <u>Id.</u>; <u>see also</u> 2

McCormick On Evidence § 288.  Neither party having yet had the chance to carry their respective

burdens, the Court will deny defendant's motion to exclude the 113 exhibits without prejudice to

defendant's renewing that motion after plaintiff submits his exhibit list.


## <u>CONCLUSION</u>

For the foregoing reasons, defendant's motion <u>in limine</u> is granted in part and denied in

---

[4] The Court emphasizes that plaintiff must meet his burden with respect to "specific
exhibits" based on its understanding of what plaintiff's Rule 803(6) argument entails.  As the
Court understands the argument, plaintiff maintains that some of the 113 exhibits were business
records maintained by ULLICO in the regular course of its operations and, accordingly, that these
exhibits qualify as an exception to the hearsay bar.  In meeting his initial burden, plaintiff would
thus have to demonstrate concretely <u>which</u> exhibits so qualify on an exhibit-by-exhibit basis.
Any argument that <u>all</u> of the exhibits constitute business records simply because former
Governor Thompson incorporated them into his report, however, would be rejected.

part as follows:

(1) defendant's motion to exclude the Senate Report is denied;

(2) defendant's motion to exclude the House Report is granted;

(3) defendant's motion to exclude the Winston & Strawn Memos is granted, subject to the

limitations explained above;

(4) defendant's motion to exclude the Thompson Report is denied as moot; and

(5) defendant's motion to exclude the 113 exhibits attached to the Thompson Report is

denied without prejudice to refiling after the parties have submitted their final exhibit lists.

A separate order has been posted on this date.

   /s/   John D. Bates      
JOHN D. BATES
United States District Judge

Dated:  December 22, 2006