# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PADDY F. BARRY,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 02-2371 (JDB)** |
| **ELLEN B. WEST,** **in her capacity as personal representative** **of the estate of Jacob West,**[*] | |
| **Defendant.** | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a civil action for breach of fiduciary duty brought under § 502(a) of the

Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a).  During

the course of the litigation, the claims against all but one of the named defendants have been

dismissed voluntarily or by order of the Court, and judgment on most claims against the

remaining defendant has been entered against plaintiff.  Familiarity with the Court's prior rulings

on these points will be presumed.  See Barry v. Trs. of the Int'l Ass'n of Full-Time Salaried

Officers and Employees of Outside Local Unions and District Counsel's (Iron Workers) Pension

Plan, 467 F. Supp. 2d 91 (D.D.C. 2006); Barry v. Trs. of the Int'l Ass'n of Full-Time Salaried

Officers and Employees of Outside Local Unions and District Counsel's (Iron Workers) Pension

Plan, Civ. A. No. 02-2371, 2006 WL 2507557 (D.D.C. Aug. 29, 2006) ("Barry II"); Barry v. Trs.

---

[*] The lone remaining defendant in this action, Jacob West, died on April 5, 2007.  Shortly thereafter, plaintiff moved to substitute Ellen B. West, in her capacity as personal representative of Jacob West's estate, as the party defendant pursuant to Fed. R. Civ. P. 25(a).  The Court granted plaintiff's unopposed motion in a Minute Order entered on May 16, 2007.

of the Int'l Ass'n of Full-Time Salaried Officers and Employees of Outside Local Unions and

District Counsel's (Iron Workers) Pension Plan, 404 F. Supp. 2d 145 (D.D.C. 2005) ("Barry I").

The only remaining defendant as a result of those earlier rulings was Jacob West, a director of the

Union Labor Life Insurance Company, Inc. ("ULLICO") and a trustee of the International

Association of Full-Timed Salaried Officers and Employees of Outside Local Unions and District

Councils Pension Plan (hereinafter "the Plan" or "the LU & DC Plan").

In denying the cross-motions for summary judgment filed by defendant West and plaintiff

Paddy Barry, the Court concluded that genuine issues of material fact existed regarding three

questions: (1) whether West knew of ULLICO's discretionary stock repurchase program and its

availability to the LU & DC Plan; (2) whether this information would have been material to the

Plan; and (3) whether any failure to disclose on the part of West caused the Plan to suffer a loss.

Barry II, 2006 WL 2507557, at *4.  A three-day bench trial directed at resolving these factual

disputes was held in February 2007.  After careful consideration of the testimony and exhibits

presented at trial, as well as the parties' Proposed Findings of Fact and Conclusions of Law, the

Court concludes that plaintiff has not carried his burden of proving that any breach of duty on

West's part caused a loss to the Plan.  Judgment will accordingly be entered in defendant West's

favor on Counts III and IV of the Second Amended Complaint, the only remaining claims in this

action.  The Court makes the following findings of fact and conclusions of law in accordance

with Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

Many of the background facts are undisputed and have been set forth in the Court's prior

opinions.  See Barry II, 2006 WL 2507557, at *1-*2; Barry I, 404 F. Supp. 2d at 148-50.  The

following paragraphs repeat some of those facts, as supplemented by the evidence presented at

trial, and delve into greater detail regarding the facts central to resolution of the case.[1]

**A. Background**

1.  The LU & DC Plan is an employee benefit pension plan within the meaning of § 3(2)

of ERISA, 29 U.S.C. § 1002(2).  Barry II, 2006 WL 2507557, at *1.  Plaintiff Paddy Barry was a

participant in the Plan.  He served as financial secretary of the Ironworkers Union from late 1992

until 2003, and was on the Plan's advisory committee from the spring of 2000 until the fall of

2001.  Trial Tr. at 30:21-23, 31:9-13 (Barry).  The Plan's advisory committee meets periodically

to review the status of the fund and to suggest to the trustees benefit improvements or other

changes.  Id. at 159:13-17 (Higgs).  It does not, however, have fiduciary responsibility or

authority to direct the Plan's investments.  Id. at 160:6-8, 11-13 (Higgs).

2.  The LU & DC Plan is administered by a three-member Board of Trustees.  Id. at

150:11-15 (Higgs).  Starting in the late 1980s, one of the Plan's three trustees was Jacob West.

Id. at 150:4-7 (Higgs); Pl.'s Exh. 77 (West 2004 Depo.) at 16.  West's tenure as trustee ended in

February of 2001.  Trial Tr. at 150:7 (Higgs).  His replacement, Michael Fitzpatrick, took over

the following month.  Pl.'s Exh. 114 (Minutes of 3/28/2001 Trustees Meeting) at 1.

---

[1] For ease of reference, the parties' Proposed Findings of Fact and Conclusions of Law
will be cited as "Pl.'s Prop." and "Def.'s Prop."  Most of the citations will be to the trial transcript
("Trial Tr.") and the exhibits received into evidence ("Pl.'s Exh." and "Def.'s Exh.").  At trial, the
Court heard testimony from the following individuals: plaintiff Paddy Barry; Arnold & Porter
attorneys Richard Baltz and Carey Smith; Damon Silvers, counsel to ULLICO's Chairman of the
Board; Alfred H. Higgs, Jr., administrator of the LU & DC Plan; Terence Collins, Vice Chairman
of Columbia Partners; Marcelle Benjamin, Assistant Corporate Secretary and custodian of
records at ULLICO; and Joseph A. Carabillo, former Chief Legal Counsel at ULLICO.

3.   Throughout his tenure as a trustee of the Plan, West also served as a director of ULLICO, a private stock company whose Board of Directors has historically consisted primarily of officers of major trade unions.  Def.'s Exh. 34 at 50-51; Def.'s Exh. 116.  Between 2000 and 2001, for example, current or former officers of 22 national unions sat on the ULLICO Board. Id.  Those national unions were affiliated with over 40 institutions -- either unions or employee benefit plans -- that held ULLICO Class A Stock.  Id.; Trial Tr. at 217:14-221:22 (Benjamin).

4.   West began as a ULLICO director in the mid-1980s and continued to serve until May of 2002.  Pl.'s Exh. 77 at 12; Pl's Exh. 118 (West 2007 Depo.) at 149.[2]  He held positions on ULLICO's Executive Committee, Compensation Committee, and Audit Committee at various times between 1998 and 2002.  Pl.'s Exh. 77 at 45, 70-71; Pl.'s Exh. 118 at 186-87.  His final position was on the Executive Committee, to which he accepted a one-year appointment in May of 2001.  Id.

5.   West was a longtime personal friend of Robert A. Georgine, ULLICO's President, Chief Executive Officer, and Chairman of the Board of Directors during the time period at issue here.  Def.'s Exh. 34 at 52; Pl.'s Exh. 77 at 15.  Georgine and West had known each other for approximately 35 years.  Id.

6.   As a director, West was offered the opportunity to purchase ULLICO stock.  Id. at 26-28.  There are three types of ULLICO stock: Class A (voting), Class B (non-voting), and Capital.

---

[2] In citing to the 2007 deposition of Jacob West, the Court recognizes defense counsel's understandable concern with Mr. West's competency to provide testimony at that time.  Trial Tr. at 109:14-16.  Having viewed the videotape of the deposition, the Court is well aware, and states here for the record, that West appeared sickly and was often confused.  The Court will therefore rely on West's 2007 deposition testimony only to the extent that it is corroborated, as here, by his 2004 deposition testimony or other evidence in the record.

Pl.'s Exh. 1 (ULLICO By-Laws) at 1-5.  West acquired both Class A and Capital stock while a

ULLICO director.  Pl.'s Exh. 68 (Stockholder Certificates).

7.  The majority of ULLICO's Class A and Class B stock was owned not by individuals

like West, but by institutional shareholders, a category that includes unions and pensions funds

sponsored by those unions.  See Def.'s Exh. 35.  Among the pension funds that acquired ULLICO

stock was the LU & DC Plan.  The Plan made its acquisition in 1992, after ULLICO offered it

and other institutions the chance to purchase preferred certificates at a price of $25 per certificate.

Def.'s Exh. 102 (Minutes of 9/10/1992 Board Meeting) at 2-3; id. (9/24/1992 Letter from Board

to Kennedy Associates).

8.  West himself was not involved in the Plan's deliberations or decision to purchase the

ULLICO preferred certificates.  Because of his dual role as a ULLICO director and Chairman of

the Plan's Board of Trustees, West recused himself from the deliberations and the decision-

making process.  Id. (Minutes of 9/10/1992 Board Meeting) at 2.  The decision was thus made by

the two remaining trustees on the advice of Kennedy Associates, the investment manager that the

Plan had hired.  Id. (9/24/1992 Letter from Board to Kennedy Associates).

9.  Kennedy Associates invested $2,750,000 of the Plan's assets in the ULLICO preferred

certificates.  Id. (Minutes of 9/10/1992 Board Meeting) at 3.  Those certificates were converted

into approximately 110,000 shares of ULLICO stock in November 1995.  Trial. Tr. at 151:3-4

(Higgs).  From 1992 until its resignation as investment manager in 2000, Kennedy Associates

had the sole responsibility for the Plan's investment in ULLICO and the sole authority to sell the

stock acquired.  Id. at 155:12-13 (Higgs).

10. After Kennedy Associates resigned in 2000, the Plan hired Columbia Partners as its

investment manager for its ULLICO holdings.  Id. at 155:20 (Higgs).  Columbia Partners began

as the Plan's Qualified Professional Asset Manager ("QPAM") in August 2000.  Id.; Def.'s Exh.

36.  Terence Collins was at that time President of Columbia Partners and later became Vice

Chairman.  Trial Tr. at 196:6-10 (Collins).

    11.  Between 2000 and 2001, Columbia Partners also served as the QPAM for three other

ERISA-covered pension plans sponsored by trade unions that held ULLICO Class A and Class B

stock: the Plumbers & Pipefitters National Pension Fund, the United Association of Local Union

Officers and Employees' Pension Fund, and the Ironworkers Staff Retirement Fund.  Def.'s Exh.

51.  On behalf of these three funds and the LU & DC Plan, Columbia Partners managed over 1.3

million shares of ULLICO Class A and Class B stock during this period.  Those 1.3 million

shares constituted approximately 16 percent of ULLICO's outstanding stock.  Id. at n.1.

**B.  ULLICO's Formal Repurchase Program**

    12.  Until 1997, the value of ULLICO's stock was fixed, and the shareholders received

value on their investment in the form of relatively large dividends.  Def.'s Exh. 6 (6/15/1997

Letter for Georgine) at 1; Pl.'s 78 (Senate Report) at 41.  The value of the stock was effectively

capped at $25 per share because that is the price at which ULLICO would repurchase the shares,

and ULLICO had a right of first refusal on all sales.  Def.'s Exh. 6; Pl.'s Exh. 1 at 1-5.

    13.  In May 1997, ULLICO jettisoned this past practice and instituted an annual

repurchase program to take place over an 11-year period.  Pl.'s Exh. 6 (Minutes of 5/5/1997

Executive Committee meeting) at 4.  The purpose of the repurchase program was to provide

liquidity to ULLICO's larger shareholders within a structured setting.  Def.'s Exh. 6 at 1; Trial Tr.

at 320:7-9 (Carabillo).  ULLICO allocated $180 million for the repurchase of Class A and Class

B stock, as well as Preferred Certificates, at a value to be set each year by the Board of Directors. Pl.'s Exh. 6 at 4.  Shares would be repurchased up to a maximum aggregate amount, and if the value of the shares tendered exceeded that amount, shareholders with 10,000 or more shares would be subject to proration.  Id.  The plan allocated $30 million for repurchases under the 1997 formal program, and anticipated that $15 million in repurchases would be made each year from 1998 through 2007.  Id.

14.   Capital shareholders were not eligible for the repurchase program, and could cash in their shares, as they had done in the past, only by tendering them to Chairman Georgine for purchase.  Def.'s Exh. 6 at 2.

15.   Kennedy Associates did not tender the LU & DC Plan's shares for repurchase in the formal programs implemented in 1997, 1998, and 1999.  Trial Tr. at 158:6-7 (Higgs).  In those years, the repurchase prices offered were $27.06, $28.70, and $53.94, respectively.  Pl's Exh. 43 (Minutes of 11/3/2000 Board Meeting) at 2.

16.   The ULLICO Board took a number of key actions at its meeting held on May 11, 2000.  The Board approved a stock price of $146.04 per share -- a substantial increase from the previous year's price of $53.94.  Pl.'s Exh. 27 (Minutes of 5/11/2000 Board Meeting) at 4; Pl.'s Exh. 43 at 2.  This sudden jump was due in large part to the increased value of ULLICO's investment in a company known as Global Crossing.  Pl.'s Exh. 17 (Minutes of 5/18/1999 Board Meeting) at 2.  Also at the May 2000 meeting, the Board conditionally approved an extraordinary repurchase program pursuant to which it would repurchase up to $250 million worth of Class A, Class B, and Capital stock at the $146.04 price.  Pl.'s Exh. 27 at 4.  The program was conditioned, however, on Global Crossing's reaching a price of $43 per share.  Id.

17.  At some point in the early Fall of 2000, the LU & DC Plan's Advisory Committee met.  Trial Tr. at 36:1-2 (Barry); id. at 160:20-24 (Higgs).  Both Paddy Barry and Jacob West attended the meeting.  Id. at 31:22-24, 35:15-16 (Barry).  Barry received at that time an asset allocation sheet, dated September 1, 2000, that noted the value of ULLICO stock the previous year and the projected future value of $146.04.  Id. 34:19-35:10 (Barry); Pl.'s Exh. 73 (9/1/2000 Asset Allocation Sheet).  Upon seeing the jump in value and that ULLICO stock at the higher price would constitute over 12 percent of LU & DC Plan's assets, Barry wanted the shares to be sold immediately.  Trial Tr. at 35:13-14 (Barry).  He approached West to ask whether the shares could be sold.  West responded that they would not be sold unless ULLICO adopted a repurchase plan, something that would not be decided until the later part of 2000.  Id. at 35:15-24 (Barry).  West did not, however, inform Barry that he had himself sold 5,250 shares of his Capital and Class A stock back to ULLICO outside of any formal repurchase program in August of 2000.  Id. at 54:3-5 (Barry).

18.  By November 2000, Global Crossing had not reached the $43 price, and the ULLICO Board decided to scuttle the extraordinary repurchase program conditionally approved in May of that year.  The Board instead approved a more limited program under which it would repurchase up to $30 million worth of stock.  Pl.'s Exh. 43 at 4.  Chairman Georgine explained at the November 3rd Board meeting that ULLICO had designated an amount of money that it could reasonably spend while still maintaining its "cash needs."  Id.  Those "needs" included plans to expand the services that ULLICO provided to the labor movement, as well as the prospective acquisition of Amalgamated Bank, a Chicago-based institution that served the labor movement.  Id.; Trial Tr. at 376:19-25 (Carabillo).  Although ULLICO did not end up acquiring

8

Amalgamated Bank, negotiations were still ongoing in late 2000.  Id. at 377:3-4 (Carabillo).

19.  The formal repurchase program approved by the ULLICO Board was open only to holders of Class A and Class B stock; Capital shares were expressly excluded.  Pl.'s Exh. 43 at 7. In order to participate, shareholders holding more than two percent of ULLICO's stock had to tender all of their shares.  Id.  If the total amount of tendered shares was more than the maximum agreed to by the Board, some shareholders would be subject to proration.  Id. at 6.  Shareholders holding fewer than 10,000 shares, on the other hand, could secure repurchase of all of their shares (and thus avoid proration) simply by tendering all of them.  Id.  Tendering fewer than all shares subjected these small shareholders to proration as well.  Id. at 6-7; Pl.'s Exh. 54 (Offer to Repurchase) at U000219.  This differing treatment of large and small shareholders had the effect of allowing individuals -- many of them company insiders -- to cash in all of their shares while institutions secured repurchase of relatively few.  Pl.'s Exh. 78 (Senate Report) at 55; Def.'s Exh. 117 (Senate Report) at 3.

20.  The LU & DC Plan suffered a fate similar to that of many other institutional shareholders.  The Plan, and Columbia Partners as its QPAM, wanted to have as many shares as possible repurchased at the $146.04 price.  Trial Tr. at 192:14-21 (Higgs); id. at 198:10-12 (Collins).  Columbia Partners thus tendered all 110,000 shares of the Plan's Class A stock on January 10, 2001.  Def.'s Exh. 41 (Letter of Transmittal); Trial Tr. at 198:8-9 (Collins).  Because the repurchase plan was oversubscribed, however, the repurchase was made on a prorated basis, resulting in the sale of 2,421 Class A shares for a total value of $353,581.61.  Def.'s Exh. 42 (2/21/01 Repurchase Letter).

21.  At the time that Columbia Partners tendered the LU & DC Plan's Class A shares for

repurchase, the Plan was in sound financial condition and had experienced no problems with respect to liquidity during the period 1999-2001.  Trial Tr. at 166:4-6, 171:11-13 (Higgs); see Def.'s Exh. 109-110 (1999, 2000 IRS Forms 5500).  This is true even though the Plan's assets decreased from 1999 to 2000, and then again from a high of $132.5 million in September 2000 to $96.1 million in October 2001.  Trial Tr. at 164:8-9, 170:8-11, 185:1-10 (Higgs).

22.  Jacob West tendered 4,000 shares of his Class A ULLICO stock for repurchase as part of the formal program.  All 4,000 of those shares were repurchased by ULLICO in early 2001, resulting in a payout of $584,160.  Def.'s Exh. 35 (Class A Ledger) at 14.

## C.  ULLICO's Discretionary Repurchase Program

23.  In addition to the formal repurchase program conducted annually as of 1997, ULLICO Chairman Georgine made occasional repurchases of Class A and Class B stock from various shareholders.  Def.'s Exh. 117 (Senate Report) at 44.  These "discretionary" repurchases were in addition to those made from Capital shareholders, since Capital shares were not eligible for repurchase under the formal program.  Trial Tr. at 288:20-24 (Carabillo).  ULLICO's Chairman, Georgine and before him Daniel E. O'Sullivan, had the exclusive authority to approve repurchase requests outside of the formal program.  Id. at 290:10-12 (Carabillo).  Georgine had tended to exercise this authority when a shareholder died, when an officer or director resigned, or when a union encountered a financial emergency.  Def.'s Exh. 117 at 44.

24.  Georgine's use of his discretionary authority changed substantially in the months after the ULLICO Board established the stock value of $146.04.  Specifically, he began repurchasing at that price Class A shares held by current ULLICO directors and officers.  Id. at 3, 44.  Between May and October of 2000, ULLICO repurchased over 20,000 Class A shares from six directors

and officers, resulting in a payout of over $3,000,000.  Def.'s Exh. 35 at 13-14.  ULLICO even

established a "Director/Officer Request for Repurchase Form" to facilitate these transactions.

Def.'s Exh. 117 at 49; Pl.'s Exh. 69 (Copy of Form).  The form does not indicate whether

shareholders other than ULLICO officers and directors were eligible for discretionary

repurchases at the $146.04 price.

    25.  Using this form, Jacob West requested the repurchase of 4,000 Class A shares and

1,250 Capital shares in August 2000.  Id.; Def.'s Exh. 35 at 14.  Those shares were repurchased at

the $146.04 price, allowing West to collect over $700,000.  Id.; Pl.'s Exh. 45 (Minutes of

3/6/2001 Compensation Committee Meeting) at U021068.

    26.  At about the same time that West was tendering his shares for repurchase, outside

counsel at the law firm of Arnold & Porter raised doubts as to whether the discretionary

repurchases being made by Georgine were permitted under the existing resolutions approved by

the ULLICO Board.  Pl.'s Exh. 33 (9/9/2000 Smith e-mail).

    27.  A new resolution, drafted by officials at Arnold & Porter and ULLICO, was prepared

in advance of the Board's November 3, 2000 meeting.  Trial Tr. at 80:9-10 (Baltz); id. at 95:7-20

(Smith).  The resolution served two purposes: it allowed the Board to "confirm" or ratify

Georgine's previous exercise of his discretionary repurchase authority, and it granted him that

authority prospectively.  Pl.'s Exh. 43 at 4, 8.  Although the resolution served this ratifying

function, Georgine disclosed to the Board members neither the details of the previous

discretionary purchases nor the fact that he had already repurchased approximately $4.5 million

in shares from ULLICO directors and officers.  Def.'s Exh. 117 at 49.  He told them in a

statement at the November 3rd meeting only that, as in the past, repurchases had been made

"from individuals, from unions and from estates."  Pl.'s Exh. 43 at 4.

28.  Georgine also sought authority to make additional discretionary repurchases in the future.  That authority would be subject, he said, to two important limitations: the repurchase price could be no greater than the one established by the Board's Executive Committee, and the amount of shares repurchased from any single stockholder could not exceed one percent of the total number of outstanding shares.  Id. at 4.  The language of the resolution adopted by the Board reflected these limitations, indicating that the Chairman could exercise the authority "in his discretion, whenever he deems it consistent with sound financial practice and the best interests of the Corporation."  Id. at 5.  The resolution did not purport to limit the Chairman to approving repurchases from any particular type of shareholder, and did not distinguish between individuals and institutions.  Id. at 5-6.  Nor did the resolution establish any other parameters to guide the Chairman's discretion.

29.  Georgine was, however, familiar with the status of many of ULLICO's institutional shareholders, and in deciding whether to honor a repurchase request, he tended to consider the amount of funds that ULLICO had available, the circumstances of the repurchase request, and the financial needs of the requesting party.  Trial Tr. at 300:8-16 (Carabillo).

30.  ULLICO informed its shareholders that it had abandoned the extraordinary repurchase plan and adopted the $30 million formal program in a letter from Georgine dated November 11, 2000.  Pl.'s Exh. 62 (Letter to West).  This letter also indicated that ULLICO retained "its right, pursuant to its By-laws, to repurchase shares outside of the Repurchase Program at $25 per share."  Id. at 2.  Nowhere in the letter did Georgine inform shareholders that the resolution adopted at the November 3rd meeting gave him discretion to make repurchases

outside of the formal program at a price as high as the one most recently approved by the ULLICO Board.

31.   Jacob West was present at the November 3, 2000 ULLICO Board meeting at which Georgine presented the resolutions regarding the formal and discretionary repurchases programs and at which those resolutions were approved.  Pl.'s Exh. 43 at 1.

32.   West was also present at the March 6, 2001 meeting of the ULLICO Board's Compensation Committee.  Pl.'s Exh. 45 at U021066.  This meeting marked the first time that Georgine had disclosed to ULLICO directors and officers specific discretionary repurchases approved since the $146.04 price was adopted.  Georgine provided a spreadsheet that listed repurchases of both Capital and Class A stock from individual ULLICO directors and officers, other individuals, and small unions.  Id. at U021068-U021073.  The spreadsheet included repurchases made between May 2000 and early March 2001, and did not reveal any repurchases from pension plans or health plans.  Id.

33.   ULLICO repurchased over 300,000 shares of Class A and Capital stock at the $146.04 price, an expenditure of $44.6 million.  Pl.'s Exh. 78 at 55.

34.   Neither the LU & DC Plan's administrator nor its QPAM, Columbia Partners, knew that holders of Class A and Class B stock were permitted to tender their shares for repurchase by the Chairman, in his discretion, at a price up to $146.04.  Trial Tr. at 190:7-8 (Higgs); id. at 202:2 (Collins).  Terence Collins, the official at Columbia in charge of the LU & DC Plan's account, knew from contact with Martin Maddaloni, a ULLICO director and trustee of another pension plan, only that holders of Capital shares could tender their shares for repurchase outside of the formal repurchase program.  Id. at 206:22-207:1, 210:11-14 (Collins).  Had Columbia

13

Partners known that Class A and B shareholders were eligible, it would have requested

repurchase of as many as possible of the Class A shares that it managed on behalf of the LU &

DC Plan and the three other large shareholders for which it served as QPAM.  Id. at 202:6-10

(Collins).

**D.  Discretionary Repurchases of Class A Shares from Institutions (1997-2003**)

35.  Between 1997 and 2003, Chairman Georgine approved fewer than ten repurchase

requests of Class A stock from institutional shareholders that can reasonably be characterized as

"discretionary" in nature in so far as they fell outside the scope of the annual formal program

approved by the ULLICO Board.  Trial Tr. at 225:1-13 (Benjamin); Def.'s Exh. 101 (Chart).

These transactions -- six repurchases, a transfer of shares, and a belated purchase in order to

settle a potential lawsuit -- will be reviewed in greater detail in the following paragraphs.

36.  The first transaction involved the United Auto Workers ("UAW") Master Pension

Trust.  In November 1997, the same month that ULLICO implemented its formal repurchase

program for the first time (Pl.'s Exh. 78 at 42), ULLICO agreed to repurchase 759,480 Class A

shares from the UAW Master Pension Trust at a price of $25 per share.  Def.'s Exh. 59

(11/5/1997 Letter to Georgine).  The book value of ULLICO stock at the time -- and the price

offered in the 1997 formal repurchase program -- was $27.06.  Def.'s Exh. 7 (1997 Annual

Report) at 2; Trial Tr. at 233:9-24 (Benjamin); Pl.'s Exh. 78 at 42.  At the $25 price, the

repurchase would cost ULLICO almost $19 million.  Def.'s Exh. 60 (11/5/1997 Letter from

Carabillo).  Because ULLICO could not afford this sum, it sought out another buyer for the

shares.  Def.'s Exh. 62 (11/12/1997 Carabillo Letter); Trial Tr. at 328:4-7 (Carabillo).  The

following month, ULLICO sold the shares acquired from the UAW Master Pension Trust to the

United Brotherhood of Carpenters ("UBC") and the UBC Pension Fund for $25 a share.  Def.'s

Exh. 72 (11/4/2001 Carabillo Letter); Def.'s Exh. 35 at 7 (12/31/1997 transactions).  ULLICO

viewed its role as that of a "transfer agent."  Def.'s Exh. 72; Trial Tr. at 333:9-13 (Carabillo).

     37.   The UAW Master Pension Trust engaged in a second transaction with ULLICO in

1997 and also sought out a third.  As part of the formal repurchase program, the Trust tendered

its shares, 90,536 of which were repurchased at a total value of almost $2.5 million.  Def.'s Exh.

67 (2/5/1998 Carabillo Memo).  In addition, the UAW Master Pension Trust requested that

ULLICO repurchase its remaining 162,579 Class A shares outside of the formal program.  Def.'s

Exh. 66 (12/30/1997 Letter to Georgine).  Carabillo balked at this request, informing Chairman

Georgine that ULLICO had already repurchased shares from the Trust under the formal program,

as well as the ones later resold to the UBC.  Def.'s Exh. 67.  Georgine declined the request to

repurchase the 162,579 shares.  Trial Tr. at 338:12-21, 339:22 (Carabillo).

     38.   In June 1999, Georgine repurchased 5,260 Class A shares from the Amalgamated

Transit Union Local No. 256 Retirees' Health & Welfare Fund ("ATU Fund").  Def.'s Exh. 75

(6/4/1999 Letter); Def.'s Exh. 35 at 11.  The shares were repurchased at the then-current book

value of $53.94 per share, resulting in a purchase price of $283,724.40.  Def.'s Exh. 75.  The

ATU Fund began inquiring about a possible repurchase in January 1999, shortly after the

deadline for participating in the 1998 formal repurchase program passed.  Def.'s Exh. 73

(2/1/1999 Note to Carabillo).  Had the ATU Fund tendered its Class A shares on time, all of

them would have been eligible for repurchase under the formal program.  Trial Tr. at 346:19-25

(Carabillo); see supra ¶ 19.  This missed deadline, along with the facts that the ATU Fund was a

health fund with liquidity needs and that the repurchase represented a relatively small

expenditure, likely led Georgine to approve the request.  Trial Tr. at 346:21-348:23 (Carabillo).

39.  In March 2001, the Secretary-Treasurer of the Building and Construction Trades Department ("BCTD") of the AFL-CIO requested both orally and in writing that ULLICO repurchase 50,000 of its Class A shares at the $146.04 price.  Def.'s Exh. 84 (2/2/2001 Letter). The request was precipitated by the BCTD's "current financial situation" and its "urgent need for increased cash flows."  Id.  Chairman Georgine had close ties with the BCTD, having served as its President for some 39 years.  Trial Tr. at 349:11-19 (Carabillo).  Moreover, some of ULLICO's customers were members of the BCTD.  Id. at 309:15-16 (Carabillo).  Georgine thus agreed in April 2000 to repurchase 25,000 shares, explaining in a letter that corporate funds had been set aside for the formal repurchase program and that, because the request came outside of that program, it would have to be paid from ULLICO's "cash reserves."  Def.'s Exh. 85 (4/10/2001 Letter).  The repurchase was made at the $146.04 price, costing ULLICO over $3.6 million, which was the amount that the company believed that it could afford to spend.  Id.; Trial Tr. at 309:17-18 (Carabillo); Def.'s Exh. 35 at 19.

40.  The next three repurchases were from separate funds of the Graphic Communications International Union Local 14-M ("GCIU").  In January 2001, GCIU Local 14-M President Andrew Douglas wrote to Georgine to request that ULLICO repurchase at the $146.04 price 4,200 Class A shares held by the GCIU's Health and Welfare Plan.  Def.'s Exh. 76 (1/8/2001 Letter).  This Plan, Douglas wrote, needed money in order to finance an increase in employer contributions.  Without additional money, "the Health and Welfare Plan cannot access the assets needed to maintain the financial health of the Plan."  Id.  In addition, all 4,200 Class A shares would have been eligible for redemption under the 2000 formal repurchase program, but the

Health and Welfare Plan incorrectly completed the request form, leading to a prorated purchase of only 92 shares ($13,500.39). Trial Tr. at 355:3-356:21 (Carabillo); Def.'s Exh. 77 (2/20/2001 Letter). GCIU Local 14-M apparently erred in its formal repurchase request by listing together the shares owned by all of its funds, which in combination exceeded the 10,000-share threshold. Def.'s Exh. 78 (3/8/2001 Letter) (listing 21,035 Class A shares); Trial Tr. at 355:3-10 (Carabillo); Def.'s Exh. 80 (2/23/01 E-mail). Georgine agreed to repurchase the remaining 4,108 Class A shares at $146.04 each, an additional payment of $599,867.61. Def.'s Exh. 78 (3/8/2001 Letter).

41. Georgine approved repurchase requests from two other GCIU Local 14-M funds on May 4, 2001. Def.'s Exh. 35 at 19. The GCIU's General Fund sought repurchase of 5,145 shares of Class A stock. Def.'s Exh. 81 (5/4/2001 Letter) at ULLICO II 000120. Its request, but for the same error in completing the request form, would have been honored in its entirety under the formal program. Trial Tr. at 362:4 (Carabillo). Georgine thus agreed to repurchase half of the shares -- 2,573 -- at the $146.04 price, for a total payout of $375,760.92. The letter transmitting the Chairman's approval contained language identical to the one approving in part the BCTD's repurchase request. Def.'s Exh. 81 at ULLICO II 000120; Def.'s Exh. 85.

42. Georgine also agreed to repurchase shares from the GCIU Local 14-M Emergecny Fund on May 4, 2001. Def.'s Exh. 81 (5/4/2001 Letter) at ULLICO II 000121. The Emergency Fund requested repurchase of 3,857 Class A shares, and Georgine once again approved repurchase of half of the shares (1,929) at the $146.04 price. Id. This resulted in a payout of $281,711.16 to the Emergency Fund, which, like its counterparts, could have had all of its shares redeemed under the formal program. Id.; Trial Tr. at 362:4 (Carabillo). The letter transmitting the Chairman's approval again included the familiar language indicating that the repurchase

17

request fell outside of the formal program and would have to be honored using ULLICO's cash reserves.  Def.'s Exh. 81 at ULLICO II 000121.

43.  In May 2002, Georgine repurchased 1,614 of the 3,228 Class A shares owned by the American Federation of State, County & Municipal Employees ("AFSCME") Pension Plan.  Def.'s Exh. 35 at 22; Def.'s Exh. 90 (5/6/2002 Letter).  The previous March, a representative of the AFSCME Pension Plan had contacted ULLICO to find out whether the Pension Plan's QPAM tendered the shares for purchase in the 2000 formal program, under which all of the shares would have been eligible for repurchase.  Def.'s Exh. 88 (March 2001 correspondence).  When the company responded that the Pension Plan's shares had never been tendered, the representative explained that its QPAM had not known what to do with the relevant documents and had thus failed to submit the repurchase request on time.  Id.; Trial Tr. at 367:6 (Carabillo).  The Pension Plan still wanted its shares repurchased.  Def.'s Exh. 88.  After consulting with outside counsel, and over a year later, ULLICO decided that repurchasing half of the Pension Plan's shares at the new book value of $74.87 constituted "equitable treatment" in light of prior practice and the fact that the Pension Plan would have redeemed all of its shares at a higher price but for an error by its QPAM.  Def.'s Exh. 89 (4/17/2002 Carabillo Memo.).  Georgine therefore approved the repurchase of the 1,614 shares, a payout of $120,840.18.  Def.'s Exh. 90.

44.  Finally, in February 2003, ULLICO entered into a settlement agreement pursuant to which it agreed to repurchase 15,000 Class A shares tendered by the International Association of Heat & Frost & Asbestos Workers Local Union Officers & Employees Pension Plan ("Asbestos Workers Pension Plan").  Pl.'s Exh. 99.  The dispute that led to the settlement stemmed from confusion surrounding correspondence sent by the Asbestos Workers Pension Plan in response to

Chairman Georgine's November 2000 letter explaining repurchase options.  ULLICO received

two similarly worded letters in December 2000 -- one from the union and one from the union

officers and employees' pension plan.  Both letters requested the repurchase of as many "shares

of Class A stock as possible."  Id. at ULLICO II 000279 (8/9/2002 Carabillo Memo to Georgine).

The numbers of shares involved was likewise similar: the Asbestos Workers Pension Plan held

41,600 Class A shares, while the union held 40,000 Class A shares.  Id.  Georgine responded to

at least one of the letters by apologizing for any confusion, and instructing the pension plan's

Secretary-Treasurer, James A. Grogan, to submit the repurchase request through the formal

offering memorandum that would be sent out.  Id. at ULLICO II 000277 (12/14/2000 Letter from

Georgine).  Georgine also spoke to Grogan, who informed him in early December 2000 that the

Asbestos Workers Pension Plan wanted to redeem a specific number of shares in order to finance

increases in salary and benefits for certain officials.  Id. at ULLICO II 000274-75 (12/6/2000

Georgine Note to Carabillo, 12/7/2000 Carabillo Memo. to Georgine).

45.   Although the union and the Asbestos Workers Pension Plan both tendered all of their

shares as part of the formal repurchase program, their requests were subject to proration,

culminating in the repurchase of only 916 shares ($133,772.64) from the Pension Plan and 880

shares ($128,575.20) from the union.  Id. at ULLICO II 000279.  In the summer of 2002, the

Asbestos Workers Pension Plan contacted ULLICO and insisted that more of its shares should

have been repurchased, ostensibly under the Chairman's discretionary authority.  Id. at ULLICO

II 000279, 000281.  ULLICO agreed to repurchase 14,084 additional shares of Class A stock --

yielding a total of 15,000 shares -- at the price of $46.58 per share, and to make a second

payment of $99.46 per share as consideration for settling any legal claims that the Asbestos

Workers Pension Plan would have against ULLICO.  Id. at ULLICO II 000285 (12/23/2002

Letter from Georgine to Grogan).  Those payments added up to a share price of $146.04 and

served to "resolve this matter as if there had been no misunderstanding at the time."  Id.  The

primary if not exclusive reason for entering into the settlement agreement was to avoid a

threatened lawsuit.  Trial Tr. at 371:7-12 (Carabillo).


## CONCLUSIONS OF LAW

**A.  Overview**

        This Court previously identified three issues whose resolution turned on material facts

that remained in dispute: (1) whether West knew of ULLICO's discretionary stock repurchase

program and its availability to the Plan; (2) whether this information would have been material to

the Plan; and (3) whether any failure to disclose on West's part caused the Plan to suffer a loss.

Barry II, 2006 WL 2507557, at *4.[3]  The most straightforward of these questions is the second

one, on which the principal evidence presented at trial was the testimony of Terence Collins, then

President (now Vice Chairman) of Columbia Partners.  Collins unequivocally and credibly

testified that information regarding the discretionary repurchase program would have been

"significant" to him and would have prompted him to tender as many shares as possible -- held

by the LU & DC Plan and the three other large shareholders for which it served as QPAM -- for

repurchase by Chairman Georgine under the discretionary program.  Trial Tr. at 200:22, 202:6-8.

------

        [3] The Court concluded in Barry I, and reaffirmed in Barry II, that West owed a fiduciary
duty to the LU & DC Plan despite having recused himself from investment decisions regarding
ULLICO.  See 2006 WL 2507557, at *4; 404 F. Supp. 2d at 153-54.  That conclusion is the law
of the case and will not be revisited here.

The Court accepts this testimony and hence has little trouble concluding that information as to the availability of the discretionary repurchase program would have been material.

By contrast, the most difficult of the three factual questions remains that of West's knowledge.  Plaintiff has introduced very little beyond the evidence already in the summary judgment record regarding whether West <u>actually</u> knew that the Plan was eligible to tender shares under the discretionary purchase program.  Based on that record, of course, the Court was unable to infer either "knowledge [or] a lack thereof on the part of West." <u>Barry II</u>, 2006 WL 2507557, at *7.  Much the same can be said after the bench trial.  Plaintiff has, however, made a stronger case that West should have known -- or was at least negligent in not learning -- of the Plan's eligibility, given that other entities that were not individuals, unions, or estates successfully participated in the discretionary repurchase program during West's tenure as a trustee.  And because proof of actual knowledge is not necessary, plaintiff maintains, he has met his burden on this point.  Pl.'s Prop. at 35-37 ¶¶ 55-57.  Defendant predictably argues that plaintiff has failed to demonstrate actual knowledge, and also opposes plaintiff's constructive-knowledge theory of liability.  In defendant's view, the broad disclosure duties that may apply where a plan beneficiary makes a direct inquiry of a trustee do not attach in cases where, as here, a beneficiary sues for a "lost investment opportunity."  Def.'s Prop. at 22 ¶ 6.  Something more -- "some degree of scienter," in defendant's words -- should be required.  <u>Id.</u> at 22-23 ¶ 7.

Although both sides present plausible legal arguments anchored in the record evidence, the Court need not resolve the close questions that underlie this issue of West's knowledge or lack thereof.  Even if West knew that the discretionary repurchase program was available to the Plan and should have disclosed that information to the Plan, plaintiff has not established that

West's failure to disclose caused a loss to the Plan.  The Court observed in its earlier opinion denying the cross-motions for summary judgment that plaintiff's case rested in large part on speculation that Chairman Georgine would have exercised his discretion to repurchase some or all of the Plan's shares upon tender, and commented that "the inherent speculation surrounding [the Plan's] alleged losses sparks a journey into the realm of 'what if.'"  Barry II, 2006 WL 2507557, at *9.  The evidence presented at trial served only to heighten the speculative nature of plaintiff's case.  Plaintiff did not offer evidence demonstrating that it was more likely than not that Georgine would have approved the purchase of any of the tens of thousands of shares that Collins said he would have tendered on behalf of both the LU & DC Plan and the three other institutions for which Columbia Partners served as QPAM.  To the extent that the evidence in the record reveals what Georgine would have done, it strongly suggests that he would have declined to approve repurchase requests that required an enormous expenditure of corporate resources and that were based on nothing more than an institution's desire to cash in on ULLICO's historically high price just as that price was declining.  Hence, the evidence does not establish that the Plan's hypothetical repurchase request, which exhibits these very characteristics, would likely have been accepted by Georgine.

## B.  Causation

Section 409(a) of ERISA renders a fiduciary liable for "any losses to the plan" that "result[] from" the fiduciary's breach of duty.  29 U.S.C. § 1109(a).  This statutory provision, and in particular the "resulting from" language, has consistently been read as creating a causation requirement -- that is, there must be a causal connection between the breach of fiduciary duty and the "loss" suffered by the ERISA plan.  See Ferrer v. Chevron Corp., 484 F.3d 776, 781 n.21 (5th

Cir. 2007) (citing <u>Willett v. Blue Cross & Blue Shield of Ala.</u>, 953 F.2d 1335, 1343 (11th Cir.

1992), and <u>Brandt v. Grounds</u>, 687 F.2d 895, 898 (7th Cir. 1982)).  Accordingly, and as the Court

explained in <u>Barry II</u>, plaintiff here "must at minimum establish that [the Plan] suffered some

loss," and also "that it has suffered some reasonably quantifiable amount of damage."  2006 WL

2507557, at *9 (citing <u>Silverman v. Mutual Ben. Life Ins. Co.</u>, 138 F.3d 98, 104 (2d Cir. 1998),

and <u>Diduck v. Kaszycki & Sons Contractors, Inc.</u>, 974 F.2d 270, 279 (2d Cir. 1992)).

It is worth reiterating at the outset that the burden of proving that West's breach of duty

caused the Plan to suffer such a loss lies squarely with plaintiff.  Plaintiff appears to argue that,

once he proves that West knew of material information and failed to disclose it, the burden shifts

to West to show that his breach of duty did not cause any loss to the Plan.  Pl.'s Prop. at 41 ¶ 62.

In support of this contention, plaintiff relies on the Eighth Circuit's statement that, "once the

ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan

. . ., the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . .

the breach of duty."  <u>Martin v. Feilen</u>, 965 F.2d 660, 671 (8th Cir. 1992).  But the burden-shifting

principle endorsed in <u>Martin</u>, by its terms, applies only where the plaintiff has already

demonstrated "a prima facie case of loss to the plan," something plaintiff has not done here.  <u>See</u>

<u>also</u> <u>Doe v. Trust Fund Advisors</u>, Civ. A. No. 02-559, 2004 WL 444029, at *5 (D.D.C. Jan. 20,

2004) (shifting burden to ERISA defendant where it was "undisputed" that the investment in

question "resulted in a loss").  As other courts have explained, the burden remains squarely on

the plaintiff's shoulders where "the very existence of damages is in dispute."  <u>See</u> <u>Kemmerer v.</u>

<u>ICI Americas, Inc.</u>, 70 F.3d 281, 290 (3d Cir. 1995); <u>accord</u> <u>Silverman</u>, 138 F.3d at 105-06 & n.1

(Opinion of Jacobs, J., for the court) (distinguishing <u>Martin</u> and holding that causation is "an

23

element of the claim" that the plaintiff bears the burden of proving).  Hence, only after plaintiff

demonstrates that West's breach of duty caused a loss to the Plan can any "uncertainties in fixing

damages" be resolved in plaintiff's favor.  See Pl.'s Prop. at 41 ¶ 62.

Plaintiff has failed to make the requisite showing.  Both parties start from the undisputed

fact that the discretionary repurchase program was, in form and substance, completely

discretionary and that the decision whether or not to repurchase a particular party's stock

belonged exclusively to Chairman Georgine.  Pl.'s Prop. at 42 ¶ 64; Def.'s Prop. at 32 ¶¶ 28-29.

Outside of price and the one-percent limitation, the only guidelines in the Board resolution itself

were that the repurchase be in ULLICO's best interests and consistent with sound financial

policy.  Pl.'s Exh. 43 at 5.  In addition to this highly generalized guidance, Joseph Carabillo, who

worked closely with Georgine in a variety of high-ranking positions during the relevant time

frame, testified that the Chairman was "very knowledgeable" about specific shareholders and that

he tended to consider the amount of funds that ULLICO had available, the circumstances of the

repurchase request, and the financial needs of the requesting party.  Trial Tr. at 300:8-16.

Carabillo's testimony was particularly informative; he had extensive knowledge of ULLICO's

affairs, worked closely with Georgine, and provided the most insight into how the discretionary

repurchase program functioned in practice.  His testimony, along with the documentary evidence

chronicling the discretionary repurchases from institutional shareholders, reveals that such

repurchases were made under limited circumstances and from shareholders who were not

similarly situated to the LU & DC Plan.

To begin with, only eight arguably discretionary repurchases of Class A stock from large

institutional shareholders were made between 1997 and 2003.  See Findings of Fact, supra at

¶¶ 35-45.  This low number serves as a substantial counterweight to plaintiff's principal mechanism for proving loss -- West's supposed inability to identify any discretionary repurchase request, either by an individual or an institution, that Georgine rejected during what plaintiff believes to be the relevant time frame of 2000-2001.  The inference that plaintiff expects the Court to draw is that, because Georgine generally honored discretionary repurchase requests, including eight from institutional shareholders, he would have done the same with respect to a hypothetical request by the LU & DC Plan.  Indeed, plaintiff goes so far as to suggest that the supposed absence of an actual denial is <u>all</u> that counts, and that any explanation as to why Georgine authorized particular repurchases is irrelevant.  Pl.'s Prop. at 7 n.2.  But this line of argument loses sight of the burden of proof.  It is not West's burden to prove a negative by showing definitively that Georgine would not have repurchased any of the Plan's Class A shares; rather, the burden rests on plaintiff to demonstrate affirmatively, and by a preponderance of the evidence, that Georgine would have repurchased at least some of the Plan's shares.  This plaintiff has not done.

Plaintiff fails to appreciate the significant differences between the particular repurchases carried out and how a repurchase request by Columbia Partners on behalf of the Plan would have looked.  One or more of the following scenarios applies to all but one of the discretionary repurchases of Class A shares from institutional shareholders that Georgine approved between 1997 and 2003: (1) the institution had especially close ties to Georgine; (2) the institution had a demonstrated need for cash; (3) the institution held less than 10,000 shares, all of which could have been redeemed under the formal repurchase program; and/or (4) the institution's attempts to secure repurchase of its shares was thwarted by a presumed mistake on its part, on ULLICO's

25

part, or on the part of its QPAM. The following table, which will be explained below,

summarizes the applicability of these scenarios to seven of the eight discretionary repurchases:

| Institution | Applicable Scenarios | Finding(s) of Fact |
|---|---|---|
| ATU Fund | 2, 3 | ¶ 38 |
| BCTD | 1, 2 | ¶ 39 |
| GCIU Local 14-M: Health & Welfare Fund | 2, 3, 4 | ¶ 40 |
| GCIU Local 14-M: General | 3, 4 | ¶ 41 |
| GCIU Local 14-M: Emergency | 3, 4 | ¶ 42 |
| AFSCME Pension Plan | 3, 4 | ¶ 43 |
| Asbestos Workers Pension Plan | 4 | ¶¶ 44-45 |

The repurchase of 25,000 shares from the BCTD, for instance, directly implicates the first

two scenarios; the union had an urgent need for cash, and Georgine had served as its President

for almost forty years. See Findings of Fact, supra ¶ 39. The second and third scenarios describe

the 1999 repurchase of 5,260 shares at $53.94 from the ATU Fund, a health fund with liquidity

needs that could (and would) have had all of its shares repurchased under the formal program.

Id. ¶ 38. The GCIU Local 14-M Health and Welfare Fund found itself in an analogous situation:

it needed money to finance an increase in employer contributions, and would have received more

money had it not improperly completed the form to participate in the formal program, thus

subjecting itself to proration. Id. ¶ 40. Although they did not have the same need for immediate

funding, the other two GCIU Local 14-M funds were likewise smaller shareholders that would

have been eligible for complete redemption of their shares under the formal program but for a

mistake in filling out the request form. Id. ¶¶ 41-42. Much the same is true of the AFSCME

Pension Plan, except that the mistake was not attributable to it, but rather to its QPAM.  Id. ¶ 43.

Had the QPAM acted in time, then all of the shares could have been repurchased at the higher

price of $146.04.  ULLICO instead agreed to an "equitable" repurchase of half of the tendered

shares at the lower price of $74.87.  Id.  Finally, and as will be discussed in more detail below, a

"misunderstanding" as to whether the shares of the Asbestos Workers Pension Plan should have

been repurchased outside of the formal program lay at the heart of ULLICO's decision to settle a

potential lawsuit with that institution by buying the number of shares at issue.  Id. ¶¶ 44-45.

The LU & DC Plan was in a strikingly different position from the other institutions whose

repurchase requests were honored.  For one thing, the Plan was suffering no liquidity problems

and thus had no urgent need for cash.  See Findings of Fact, supra ¶ 21.  Nor did it have a special

connection to Georgine.  These two factors distinguish the Plan's situation from that of the BCTD

repurchase, which constituted the largest number of shares repurchased from an institution

outside of the UAW Master Pension Trust transfer (discussed infra).  See id. ¶ 39.  Moreover, the

Plan was not a small shareholder that fit under the threshold of 10,000 shares.  This meant that

the Plan could not have redeemed all of its shares as of right under the 2000 formal program and

consequently could not have avoided proration.  Neither the Plan nor its QPAM made noticeable

mistakes in filling out the repurchase request for the formal program, and there is no evidence of

confusion as to whether the Plan sought repurchase of its shares outside of the formal program.

Indeed, the Plan secured repurchase of all of the shares to which it was entitled under the terms

of the formal program, something that cannot be said for five of the other institutions.  The LU &

DC Plan, in short, was in a situation similar to that of many other large institutional shareholders,

but different from the institutions whose requests Georgine approved.  There is simply no

evidence in the record -- and there is credible testimony from Carabillo to the contrary, Trial Tr. at 378:21-379:5 -- that Georgine would have granted the Plan's request, approved a massive expenditure of company funds, and run the risk that other large, financially stable entities would then besiege ULLICO with similar repurchase requests.  The seriousness of this last risk cannot be underestimated.  If ULLICO was at all concerned with its bottom line, and Carabillo credibly testified that it was, id. at 379:19-24, then Georgine would not have been blind to one serious implication of authorizing repurchases from large institutional shareholders -- namely, that it might well lead ULLICO closer to the $240 million in repurchases that had been rejected by the Board as unsound at the November 2000 meeting.  See id. at 378:21-24 (Carabillo).

Any doubts about this conclusion are dispelled by taking a closer look at the circumstances under which a hypothetical tender by Columbia Partners would have been presented to ULLICO.  Collins testified at trial that, had he known about the Plan's eligibility for the discretionary program, he would have tendered not only as many of the LU & DC Plan's Class A shares as possible, but also those owned by three other institutions for which Columbia Partners served as QPAM.  Trial Tr. at 202:6-8, 204:12-20 (Collins).  In other words, Columbia Partners would have tendered the maximum number of shares possible under the Board's resolution -- one percent of the outstanding stock -- for each of the four plans.  This amounts to 81,859 shares for each plan, or over 327,000 shares total.  Def.'s Exh. 51 (Chart); Trial Tr. at 251:14-15, 254:14 (Benjamin).  At a price of $146.04, repurchase of these shares would have cost ULLICO almost $48 million -- that is, almost $18 million more than the amount allotted for the 2000 formal repurchase program, and over $3 million more than what ULLICO actually spent on the formal and discretionary programs combined over several years.  Def.'s Exh. 51; Pl.'s Exh.

78 at 55.  Plaintiff insists throughout that Georgine treated institutional shareholders consistently by repurchasing 50% of the shares that they tendered, and that he would have at the very least done the same for the LU & DC Plan.  But the record evidence establishes, and plaintiff in essence concedes, that ULLICO could not have afforded to repurchase even 50% of 327,000 shares, a transaction that still would have cost the company almost $24 million.  See Trial Tr. at 373:7-378:25 (Carabillo); Pl.'s Prop. at 46 ¶ 71 (accepting Carabillo's testimony on this point). Indeed, repurchasing even 50% of the LU & DC Plan's shares alone would have required an expenditure of close to $6 million.  All of this is to say that Georgine would have received a group of repurchase requests (a) that were submitted by stable institutions demonstrating no special need and (b) that, if granted, would have required a massive expenditure of company funds.  Plaintiff has produced no evidence suggesting that Georgine would have thrown caution to the wind in repurchasing all or even half of the Plan's shares, or that he would have risked creating a precedent by repurchasing any of them.  Trial Tr. at 378:21-24, 379:4-5 (Carabillo) (discussing the problems with selectively granting repurchase requests and word traveling among the "small universe" of large shareholders).

Finally, to the extent that ULLICO's dealings with the UAW Master Pension Trust in 1997 shed light on the questions of loss and causation, those transactions further undermine plaintiff's position.  Neither party puts much emphasis on the repurchase of 759,640 Class A shares at a below-book price of $25 per share, and with good reason.  Both Carabillo's testimony and documentary evidence confirm that ULLICO could not afford the $19 million outlay, and hence held those shares briefly and acted merely as a "transfer agent."  Findings of Fact, supra ¶ 36.  More telling is ULLICO's refusal to repurchase an additional 162,579 shares on a

discretionary basis.  In addition to the transfer, the UAW Master Pension Trust had secured

repurchase of 90,536 shares under the 1997 formal program.  Id. ¶ 37.  At least some ULLICO

officials believed that the Pension Trust had eaten at the company trough enough for that year,

and Georgine eventually declined to approve the discretionary-repurchase request.  Id. (citing

Trial Tr. at 338:12-21, 339:22 (Carabillo)).  This does not definitively prove that Georgine would

likewise have rejected a repurchase request by the LU & DC Plan.  Nevertheless, it does show

that Georgine did not approve all repurchase requests from Class A shareholders as a matter of

course, and thus negates the force of plaintiff's argument that no discretionary repurchase request

was refused by Georgine between 2000 and 2001.  Pl.'s Prop. at 8 ¶ 14.  The simple rejoinder to

plaintiff's position is that Georgine in fact rejected the repurchase request most similar to a

hypothetical one on behalf of the LU & DC Plan -- a request by a large institutional shareholder

that had already participated to the fullest extent possible in the formal repurchase program.

See Def.'s Prop. at 36 ¶ 35.  Plaintiff has at best shown that Georgine might have treated a

discretionary repurchase request from the Plan differently than the earlier one by the UAW

Master Pension Trust.  But this falls far short of proving that Georgine more likely than not

would have approved such a repurchase request and that the Plan in fact suffered a loss.

Plaintiff advances two alternative theories for proving that West's failure to disclose

caused the Plan to suffer a quantifiable loss.  Columbia Partners' tender of 81,859 shares, plaintiff

submits, would have either (1) been handled in a manner similar to the settlement received by the

Asbestos Workers Pension Plan in 2002, or (2) been grouped with tenders made by other

institutional shareholders outside of the formal repurchase program, resulting in the repurchase of

shares on a pro rata basis.  Pl.'s Prop. at 45 ¶ 68.  Both of these theories are highly speculative,

and while either one might be a plausible means of approximating damages, neither comes close to proving by a preponderance of the evidence that the Plan suffered a loss in the first place.

The settlement theory is puzzling.  As a factual matter, the LU & DC Plan had no claim -- that is, no potential lawsuit -- to settle with ULLICO.  The documentary evidence in the record reveals substantial confusion as to the nature and extent of the repurchase request made by the Asbestos Workers Pension Plan in late 2000.  Pl.'s Exh. 99; Findings of Fact, <u>supra</u> ¶ 44.  This confusion, which Georgine himself later referred to as a "misunderstanding," Pl.'s Exh. 99 at ULLICO II 000285, formed the basis for possible legal action against ULLICO.  The threat of such legal action, in turn, prompted the confidential settlement agreement.  Findings of Fact, <u>supra</u> ¶ 45.  The LU & DC Plan, in contrast, had no ground for asserting a claim against ULLICO.  Indeed, the main thrust of plaintiff's claim here is that the Plan did not know about the discretionary repurchase option and therefore could not have tendered its shares.  Having made no attempt to tender on a discretionary basis, the Plan could not have complained that ULLICO misunderstood the nature of its repurchase request or otherwise acted improperly in refusing to approve such a request.  In the end, plaintiff cannot demonstrate that the Plan suffered a loss simply by contending that the Plan would have been able to settle non-existent legal claims.[4]

Plaintiff's second theory fares no better.  Adding together the discretionary repurchases from four other institutional shareholders made in early 2001, plaintiff calculates that ULLICO

---

[4] To the extent that plaintiff means to argue that the Plan would have threatened legal action once the details of the discretionary repurchase program came to its attention, any such argument is again far too speculative to prove loss or causation.  The Court would have to infer that, upon learning about the program, representatives of the Plan would have approached ULLICO officials, threatened a lawsuit, proffered a factual basis for that lawsuit, and that ULLICO would have agreed to settle the potential suit.  None of these inferences is fairly supported by the record evidence.

had a little over $5 million available to make repurchases.  Pl.'s Prop. at 10-11 ¶ 17.  Plaintiff

then surmises that, had Columbia Partners tendered the 327,432 shares on behalf of the LU &

DC Plan and the other three plans for which it served as QPAM, ULLICO would have placed

those tenders in the same pool as the other four institutions, dividing the $5 million eight ways

instead of four.  Id. at 46-47 ¶ 71.  If the repurchases were made on a pro rata basis, ULLICO

would have bought approximately 7,000 shares from the Plan at $146.04, resulting in receipt of a

little more than $1 million.

　　　　This theory, like plaintiff's others for proving loss, rests not on the facts in the record, but

on a series of unproven and often untenable assumptions.  To start with, plaintiff presumes that

ULLICO would have equated the tender of almost 82,000 shares from each of four institutional

shareholders (a total of over 300,000 shares) with the previous four tenders, which together

sought the repurchase of less than 70,000 shares.  For the reasons explained above, however, the

record evidence strongly suggests that Georgine would have viewed such substantial tenders

from the large plans represented by Columbia Partners in a far different light that those made by

the other institutional shareholders in question.  There is also no evidence to support plaintiff's

contention that ULLICO had set aside a specific pool of money -- $5,023,921, to be exact -- to be

distributed among institutional shareholders that participated in the discretionary program.  To

the contrary, plaintiff's reliance on the fact that ULLICO spent a combined $44.6 million on the

formal and discretionary programs shows that the company had more than $5 million available,

albeit money that was to be spent in part on Capital shares not eligible for redemption under the

formal program.  See Pl.'s Prop. at 44 ¶ 67.  Plaintiff is therefore undoubtedly correct that

ULLICO had funds on hand.  But it does not follow from this either that there was a fixed and

identifiable amount of money allotted or that, when confronted with Columbia Partners' hypothetical large tender, ULLICO would have felt compelled to honor the Plan's request just for the sake of doing so.

Indeed, plaintiff's <u>pro</u> <u>rata</u> breakdown necessarily assumes that the other four institutional shareholders, whose requests Georgine honored for case-specific reasons, would have had fewer shares repurchased and received less cash in return.  Plaintiff offers no explanation for <u>why</u> Georgine would have approved additional repurchases when doing so would have meant that the union with which he was personally closest and that had the most urgent need for liquidity -- the BCTD -- would see its cash receipts drop substantially.  <u>See</u> Def.'s Exh. 84 (noting the BCTD's "urgent need for increased cash flow"); Trial Tr. at 349:17-22 (Carabillo) (recalling Georgine's close ties to the BCTD).  By plaintiff's own calculations, the BCTD would go from collecting over $3.6 million to receiving less than $700,000.  <u>Compare</u> Pl.'s Prop. at 11 ¶ 17, <u>with</u> <u>id.</u> at 47 ¶ 71.  In exercising his almost unfettered discretion, Georgine surely would have noticed the effect of a <u>pro</u> <u>rata</u> distribution on an institutional shareholder whose interests he was keenly interested in protecting.  This inability to account for Georgine's motivations is yet another example of the factual weaknesses and implausible suppositions that undermine plaintiff's alternative (and speculative) theory for proving that the LU & DC Plan suffered a loss.[5]

**C.  Conclusion**

The Court concludes that information that the discretionary repurchase program was

---

[5] Defendant is correct that plaintiff's alternative request for disgorgement of any profits realized by West when ULLICO repurchased his shares, advanced only in a footnote in plaintiff's post-trial brief, Pl.'s Prop. at 47 n.14, is foreclosed by the Court's prior ruling that West did not earn a profit through the use of ERISA plan assets.  Def.'s Prop. at 38 ¶ 39 (citing <u>Barry I</u>, 404 F. Supp. 2d at 152-53; Dkt. # 68 (Mem. Op. of 3/11/2004) at 7-10).

available to institutional shareholders would have been material and that whether West actually or constructively had knowledge of such information remains a close question. But assuming without deciding that plaintiff could prove that West had the requisite knowledge and that he breached his fiduciary duty by failing to disclose it to the Plan, plaintiff nonetheless has not carried his burden of proving by a preponderance of the evidence that the failure to disclose caused a loss to the Plan. The evidence presented at trial reveals that Georgine had virtually unfettered discretion in making repurchases outside of the formal program and that, to the extent that he exercised his discretion in a consistent and foreseeable manner, he made repurchases from institutional shareholders under circumstances far different from those that would have been present upon a hypothetical repurchase request by the LU & DC Plan. Approving Columbia Partners' hypothetical tender of shares held by the LU & DC Plan and three other large shareholders would have required a massive expenditure of ULLICO's funds on behalf of several large shareholders, at least one of which (the LU & DC Plan) had already participated to the fullest degree possible in the formal repurchase program and did not have an immediate financial need. The record simply does not support the inference that Georgine would have exercised his discretion to approve the repurchase of any, let alone many, of the LU & DC Plan's shares. And because neither of plaintiff's alternative theories raises more than a speculative possibility that West's failure to disclose caused the Plan to suffer a quantifiable loss, plaintiff has not carried his burden.

In concluding that plaintiff has not proved his claim, the Court by no means intends to condone the conduct of West, Georgine, or any of the other high-ranking ULLICO officials who played a prominent role in the company's well-documented troubles in recent years. That the

misconduct on the part of those officials has spawned significant litigation, internal corporate

reforms, and investigations by both houses of Congress speaks to the seriousness of the issues

raised and the need for accountability.  Plaintiff's attempt to seek such accountability on behalf of

the Plan is therefore understandable, and the Court takes no pleasure in reaching the conclusion

that it does today.  But plaintiff's potentially laudable objectives and West's status as an

unsympathetic defendant do not alter plaintiff's burden of establishing each element of his claim

by a preponderance of the evidence.  Because plaintiff has not met that burden here, judgment on

Counts III and IV of the Second Amended Complaint must be entered in favor of defendant

West.  Judgment will be entered concurrently herewith on a separate document pursuant to Rule

58(a) of the Federal Rules of Civil Procedure.

   /s/   John D. Bates     

JOHN D. BATES
United States District Judge

Dated:  August 28, 2007